Carrie–Merle **SMITH**, Plaintiff–Appellee, Cross–Appellant,

v.

**CHICAGO SCHOOL REFORM BOARD OF TRUSTEES**, Defendant–Appellant, Cross–Appellee.

Nos. 97–2824, 97–2871, 98–1616 and 98–1658.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1998.

Decided Jan. 21, 1999.

Rehearing and Rehearing En Banc Denied Feb. 16, 1999.

William J. Raleigh (argued), Raleigh & Cahill, Chicago, IL, for Plaintiff–Appellee in Nos. 97–2824 and 98–1616.

William J. Raleigh (argued), Raleigh & Cahill, Chicago, IL, for Plaintiff–Appellant in Nos. 97–2871 and 98–1658.

Jerold S. Solovy, Norman M. Hirsch (argued), Rodney D. Joslin, Kenneth A. Kroot, Jenner & Block, Chicago, Illinois, for Defendant–Appellee, Cross–Appellee.

Before CUMMINGS, EASTERBROOK, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

According to the final pretrial order that governed the trial of this case, the parties agreed that Carrie–Merle Smith, a teacher at Collins High School in Chicago, was the victim of racial discrimination. Smith is white; most of the students, faculty, and administrators at the school are black. After she reported an assault and battery by faculty member Elbert Teague, who called Smith a "goddamn white bitch [who] don't belong here" and threatened to kill her—conduct for which Teague was prosecuted and convicted—the faculty and administration of the school made her life miserable on account of her race. The jury was told that the parties agreed that "[a] racially hostile atmosphere existed at Collins H.S." and that "the intimidation and racial harassment at Collins H.S. was unbearable" to Smith. A psychiatrist testified that as a result of this harassment Smith suffered a mental and physical breakdown. Emphasizing the extent to which the school system accepts Smith's version of events, her lawyer hammered away during closing argument on the fact that the school system had called no witnesses of its own and barely questioned the testimony of hers. Predictably Smith prevailed, and the judgment in her favor, including attorneys' fees, exceeds $2 million.

■ What the jury heard was a sham. Although the school district concedes that Teague abused Smith, it denies that she was the victim of racial harassment at the hands of other teachers and administrators; the persons Smith accused of vexing her denied the allegations under oath in depositions; and there were substantial problems with the damages evidence as well (for example, the psychiatrist first saw Smith two years after she was transferred away from Collins High School, and four years after Teague's criminal assault). Most of the events that were narrated occurred well outside the statute of limitations. But the jury knew none of this—in part because the district judge held the school system to a pretrial order that Smith's lawyer drafted, and in part because the judge informed the school system that it could call witnesses only with the plaintiff's consent. Needless to say, consent was withheld. The result was a kangaroo court, different only in the trappings from a default judgment. Appellate review of sanctions is deferential, see *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), but we are confident that the district judge abused his discretion and committed a legal error to boot.

The legal error is subtle but important. The district judge permitted plaintiff's coun-

sel to file her dream version of a pretrial order after concluding that defendant failed to meet a deadline for submitting its own version. Civil Rule 16(f) provides that if a party fails to comply with a scheduling order, the court "may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D)". This list of appropriate sanctions implies that the sanction provided in Rule 37(b)(2)(A) is *not* "just" for this kind of infraction; using the "among others" language to authorize use of a Rule 37(b)(2)(A) sanction would nullify its omission from Rule 16(f)'s enumeration. See *J.F. Edwards Construction Co. v. Anderson Safeway Guard Rail Corp.*, 542 F.2d 1318, 1322 (7th Cir. 1976). Cf. *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 653 n. 8 (7th Cir.1989) (en banc) (Rule 16 does not authorize a judge to compel a party to stipulate to facts). Here is the list in Rule 37(b)(2):

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

(E) Where a party has failed to comply with an order under Rule 35(a) requiring that party to produce another for examination, such orders as are listed in paragraphs (A), (B), and (C) of this subdivision, unless the party failing to comply shows that that party is unable to produce such person for examination.

The judge's order barring the school system from presenting witnesses is the sort of sanction contemplated by Rule 37(b)(2)(B); permitting Smith to file a final pretrial order informing the jury that disputed factual issues actually were *agreed* between the parties, or otherwise "established", is the sort of sanction contemplated by Rule 37(b)(2)(A). The (b)(2)(A) sanction is more powerful than the (b)(2)(B) sanction because it disables the party from doing anything to contest the allegation, and this must account for its omission from the list in Rule 16(f). A litigant precluded under Rule 37(b)(2)(B) from presenting its own witnesses still can contest the other side's evidence, by cross-examination or by argument demonstrating its shortcomings. But an order deeming facts "established" or "uncontested" removes that resource. Defendant in this case could do nothing but grit its teeth while Smith's lawyer presented her story and told the jury that her opponent agreed with every word.

■ Use of the Rule 37(b)(2)(A) sanction would be harmless error if the transgression were serious enough to justify a default judgment—for this is what Rule 37(b)(2)(A) effectively authorizes. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Many times we have held that failure to participate in the pretrial process, whether by abandoning the litigation or by obstructing some vital step, permits a court to award summary victory to the other side. E.g., *Newman v. Metropolitan Pier & Exposition Authority*, 962 F.2d 589 (7th Cir. 1992); *In re State Exchange Finance Co.*, 896 F.2d 1104 (7th Cir.1990). Events here did not justify that step, however. Smith filed suit in November 1994, and for more than two and a half years the parties engaged in motions practice, discovery, and other steps to prepare the case for trial. The judge set a trial date of June 16, 1997, and directed the parties to exchange drafts of pretrial orders and confer with a view to producing an agreed order by May 20. A scheduling order called for defendant to furnish Smith with a list of witnesses and exhibits 40 days before trial—although the same order *also* called for the witness and exhibit

lists to be furnished 30 days before trial. Defendant furnished its lists 31 days before trial and learned to its sorrow that the judge deemed this a fatal misstep. Defendant's lists also were not very helpful; instead of informing plaintiff and the court of the witnesses counsel reasonably expected to call, they included 122 names, almost everyone mentioned in discovery materials. (To avoid damage to reputation, we note that the lawyers who pulled this stunt were not associated with the firm that now represents the school system.) Worse still in the judge's eyes, defendant asked for a two-day extension (until May 22) to finish up the pretrial order. This might not seem long—defendant offered the plausible explanation that Smith's lawyers had been a week late in furnishing their own (incomplete) draft—but it was to the judge a grievous offense, aggravated by the fact that the extension was *granted*.

What happened is this. Under Local Rule 5.00 ¶¶ 2(i), (6), and note 10, the plaintiff is principally responsible for preparing the pretrial order and must submit a draft, together with a trial brief identifying the theory and elements of liability, to the defendant at least 11 days before the pretrial order is due. Thus Smith's counsel should have produced their draft by May 9. Smith's lawyers provided a partial draft pretrial order on the afternoon of Friday, May 16, a week late and only two business days before the May 20 deadline. Some material ordinarily included with pretrial orders was missing, and the draft put plaintiff's principal contentions in the category of "agreed" facts, which did not help the parties find common ground. Late on the evening of May 19 defense counsel faxed plaintiff's lawyers their draft, which moved plaintiff's "uncontested" facts to the "contested" section. Defendant's draft was incomplete; like Smith's it lacked a trial brief, and proposed *voir dire* questions and jury instructions also were missing. Each side asserts that it offered to meet on May 20 to negotiate a final, agreed pretrial order, but that the other side refused. At noon on May 20 Smith's lawyers informed defense counsel that they would file their own version of the pretrial order that afternoon without further negotiation. One of the attorneys representing the school system called Judge Holderman's chambers asking what to do. According to an affidavit filed by the lawyer who made this call, someone in Judge Holderman's chambers said that the judge was gone for the day and that the matter should be taken up with Judge Zagel, then serving as the emergency judge. Both sides appeared that afternoon before Judge Zagel, who granted the school system an additional two days and instructed Smith's lawyers not to file the pretrial order. Disobeying this direction, plaintiff's counsel filed their version of the pretrial order anyway—a step Judge Holderman condoned when he held a hearing on May 22. At this hearing Judge Holderman accused defense counsel of circumventing his authority:

> The Court: No, no. You answer my question why you went before Judge Zagel, who is at the north end of the 21st floor, as opposed to Judge Holderman, who is at the south end of the 21st floor, presiding over this case.
>
> Mr. Wattley [defense counsel]: It's my understanding, your Honor, that when the emergency motion was filed, it was put on the emergency call, and I think Judge Zagel was handling emergency motions that day. That's my understanding.
>
> The Court: No, Judge Holderman has been sitting here. I've been sitting here every day this week. There is no call to go to the emergency judge, absolutely none whatsoever. Why did you go to the emergency judge?
>
> Mr. Wattley: Again, your Honor, it's my understanding that because it happened late in the afternoon on the 20th—
>
> The Court: Late in the afternoon? I was here late in the afternoon.
>
> · · ·
>
> The Court: I want [Ms. Springs, the attorney who presented the motion to Judge Zagel] here, this morning. Go. Call her. Get her here.
>
> Mr. Wattley: Yes, your honor.
>
> The Court: This is ridiculous.

Judge Holderman eventually remembered that he had gone home sick on May 20 and had not been available at the courthouse that

afternoon. But this did not lead him to withdraw his criticism; instead he opined (without knowing what had transpired) that defense counsel must have made misrepresentations to Judge Zagel, and the colloquy continued:

Ms. Springs: But, your Honor, the order from Judge Zagel was that we should file a motion if we were continuing to have problems. I—

The Court: Judge Zagel is wrong.

Ms. Springs: I—

The Court: Judge Zagel should not have interfered with my orders. I am shocked, I am absolutely shocked, that Judge Zagel would enter an order that did not require compliance with my earlier orders in this case. I am absolutely shocked. And I will take this up with him personally.

I am also shocked at your conduct by not notifying my minute clerk, so that even though I was out of the courthouse and even though I wasn't well, I could certainly have addressed this matter, as happened many times with my clerk.

Judge Holderman did more than "take this up with [Judge Zagel] personally." He reprobated the school system by treating Smith's draft pretrial order—the document Smith's lawyer had filed in defiance of Judge Zagel's instructions—as the definitive pretrial order. Almost everything that has happened since in this litigation was ordained by that decision.

■ Whether or not Judge Zagel should have issued an order, he did so, and that order became the law of the case. A decision by the emergency judge "has the same effect as if the assigned judge had taken the same action." *United States v. Teresi*, 484 F.2d 894, 898 (7th Cir.1973). Judge Holderman should have respected it and deemed any filing by May 22 timely; he certainly should not have absolved Smith's violation of Judge Zagel's directions by blessing her draft of May 20 as the final pretrial order. If counsel erred in approaching Judge Zagel on May 20—if, as Judge Holderman stated, a litigant must not go to the emergency judge about procedural matters even when the assigned judge is out of the courthouse—then Judge Zagel should have said so on the spot; what

Judge Holderman thought on May 22 could not change what Judge Zagel did on May 20. Disagreements between district judges about the best way to deal with matters such as this should be handled within the court by the adoption of local rules or operating procedures. It is altogether inappropriate to punish one litigant $2 million for going to the emergency judge when the judge assigned to the case is home ill.

■ When denying the school system's motion to reconsider, Judge Holderman stated that the version defense counsel filed on May 22 still was incomplete, and that the school system had not filed any motions *in limine*. He continued: "The document contains false statements. ... Defense counsel's repeated failures to comply with this court's order and procedures have precipitated this order." The court did not identify which statements in the defense draft of the pretrial order are false, and Smith's brief in this court has not furnished the missing details. We have never before heard of penalties for failure to file motions *in limine*; these are optional, and no litigant is obliged to ask the judge before trial to exclude an opponent's evidence (or, for that matter, to object at trial). The draft of May 22 was incomplete only to the extent that it lacked jury instructions, and the appropriate response to this omission would have been to give the instructions Smith proposed in her version of the pretrial order, provided they were reasonably accurate statements of the law. The district judge never explained why going through the empty exercise of a trial with the plaintiff's version of events "agreed" was a response proportional to the wrong— for one way in which the school system's draft pretrial order has been adequate from the outset is its identification of which allegations are contested. Proportion to the harm is an essential part of sanctions practice. *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1127 (7th Cir.1997); *Lorenzen v. Employees Retirement Plan*, 896 F.2d 228, 232 (7th Cir.1990). See also *Ball v. Chicago*, 2 F.3d 752 (7th Cir.1993).

This case represents a pattern all too common in litigation. Each side is a few days

late with its filings and blames the other; neither side is very cooperative, so deadlines that might have been met with joint effort slip by. Smith's skewed draft of a pretrial order required her adversary to start afresh, and her delay in producing any draft (coupled with the lack of a trial brief, which made it hard for defendant to start formulating jury instructions appropriate to plaintiff's theories) conduced to delay on the school system's part. Smith attributes her tardiness to discovery that stretched into May 1997, for which she blames defense counsel; but they reply that the report of Smith's psychiatrist was turned over late, which caused the protraction of depositions. On and on the chain of explanations and excuses goes. Maybe Smith's lawyers are less to blame; certainly defendant's absurd list of 122 witnesses (including some who were deceased!) complicated Smith's task of winnowing disputes for the pretrial order and preparing for trial. But a district judge should handle these petty quarrels short of awarding outright victory to one side. *Stafford v. Mesnik*, 63 F.3d 1445 (7th Cir.1995), which holds that a party may not be defaulted for failing to cooperate with opposing counsel in drafting a pretrial order, is equally applicable to the practical equivalent of default that was selected here. (The School Board's brief relies heavily on *Stafford*; tellingly, Smith's brief does not mention that case.)

If, as the judge wrote when denying the motion for reconsideration, the school system failed to file timely responses to Smith's motions *in limine*, then the right solution was to grant those motions. Similarly Judge Holderman could have dealt with problems in the defense exhibit list—some of the proposed exhibits had not been turned over in discovery—by barring use of the offending exhibits. An order preferring Smith's proposed jury instructions over the school system's untimely submissions would have been another proportionate sanction. Then there is the universal solvent of money. If delay caused demonstrable harm, for example by requiring Smith's lawyers to work longer hours, the judge could have ordered defense counsel to foot the bill. Financial exactions redress actual injury without either overcompensating the aggrieved party or penalizing the client. What the judge could not do, without abusing his discretion, was order the school system to pay $2 million for counsel's delicts.

◼ Having concluded that the judgment cannot stand, we must decide what issues remain for decision on remand. Smith invoked both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The bulk of the damages depends on § 1981, because a Title VII award is subject to a statutory cap. See 42 U.S.C. § 1981a(b)(3). Recovery under § 1981 is problematic, however, for although the accused perpetrators of discrimination are the teachers and administrators at the schools where Smith worked, the only defendant is the School Board, an agency of municipal government—and recovery against a governmental body under § 1981 may not be based on *respondeat superior*. The plaintiff must show that the body's official policy or custom was discriminatory. See *Jett v. Dallas Independent School District*, 491 U.S. 701, 736–37, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), applying to suits under § 1981 the principles devised for § 1983 litigation by *Monell v. New York Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). See also *Federation of African American Contractors v. Oakland*, 96 F.3d 1204, 1215 (9th Cir.1996) (concluding that this aspect of *Jett* remains good law after the 1991 amendments to § 1981). Demonstrating that an executive official, even a high ranking one, engaged in discrimination is insufficient. *Auriemma v. Rice*, 957 F.2d 397 (7th Cir.1992). Smith does not contend that the School Board discriminates against white teachers as a matter of policy; that she worked in predominantly black schools between 1975 and 1991 without experiencing discrimination is telling evidence to the contrary. Other white teachers at the schools where Smith worked also found the environment nondiscriminatory. Smith's troubles began only after she pressed charges against Teague in 1991, about the time Chicago embarked on a program of decentralized school administration that relaxed the School Board's control over local administrators. See *Pittman v. Chicago*

*Board of Education,* 64 F.3d 1098 (7th Cir. 1995) (describing the local school councils that gained responsibility for selecting principals). Most if not all of Smith's grievances have to do with the conduct of these local councils and administrators, and although she accuses the School Board of not doing enough to deal with the persons who she says harassed her, shortcomings of this kind are distinct from a policy or custom of racial discrimination. Cf. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Challenged by the School Board to explain how the award under § 1981 may be reconciled with *Monell, Jett,* and *Auriemma,* Smith's presentation on appeal ignores *Auriemma* and contends that the Board has forfeited reliance on *Monell.* How so, given that the argument was presented to the district court in the Board's trial brief, again at the close of Smith's case (via motion under Fed.R.Civ.P. 50), and a third time in post-trial motions? Smith's answer, to quote her brief: "The parties must rely upon the pretrial conference to inform them of the specific issues in controversy and this is why a pretrial order supersedes the pleadings. . . . The *Monell* defense was not contained in the pre-trial order entered by the trial court." Well, of course it wasn't in the pretrial order, for Smith's lawyers crafted that document to leave out any issues that might impede her recovery. Now that we have decided that the lopsided pretrial order should not have been entered, claims of forfeiture based on its contents become untenable.

■ There is a more fundamental problem. *Monell* does not create a "defense". It identifies an element of a plaintiff's claim, so the burden is on the plaintiff to demonstrate the essential policy or custom. See, e.g., *Board of County Commissioners v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[I]n *Monell* and subsequent cases, we have required *a plaintiff* seeking to impose liability on a municipality . . . to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.") (emphasis added). *Brown* added that "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate

decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law", *id.* at 404, 117 S.Ct. 1382, a requirement Smith did not attempt to meet. A school board's failure to suppress discriminatory conduct affecting a single teacher cannot reasonably be described as a pro-discrimination custom with "the force of law." So as this case was presented to the district court, neither Smith's allegations nor the evidence came close to satisfying *Monell*'s standard of liability.

Should Smith be extended an opportunity to satisfy *Jett, Monell,* and *Auriemma* on remand? We think not, for a reason Smith herself emphasized: "The parties must rely upon the pre-trial conference to inform them of the specific issues in controversy and this is why a pre-trial order supersedes the pleadings. . . . The *Monell* [element of the claim] was not contained in the pre-trial order entered by the trial court." Given a free hand to draft the final pretrial order, Smith left out any allegation that the School Board has a policy of discrimination, or a custom of discrimination so entrenched that it has acquired the force of law. Even in her appellate brief, Smith identifies only one concrete action the Board took: it suspended her in December 1991 for falsifying time records. Smith believes that this was a result of bogus information furnished to the Board by the principal at Collins High School; it would therefore be impossible for a rational jury to treat this step as proof that the Board has a policy or custom with the force of law supporting racial discrimination by subordinate administrators. Smith missed her chance— and although the first trial was bollixed she has not offered sufficient reason to think that a second opportunity would alter the outcome.

Section 1981a(b)(3)(D) sets a $300,000 limit on compensatory damages under Title VII. Smith believes that she is eligible for $900,000, because news of her decision to press criminal charges against Teague (and to file a charge of racial discrimination against the administrators at Collins) followed when she was transferred in 1993, and again when she moved to a third school in 1995. Each time,

she contends, once they learned what had occurred at Collins High School, the faculty and administrators turned against her and began racial taunts and other forms of discrimination. According to Smith, the cap applies separately to each claim of discrimination, of which she believes she has three—one for each school. Smith recognizes that *Hudson v. Reno*, 130 F.3d 1193 (6th Cir. 1997), cert. denied, —— U.S. ——, 119 S.Ct. 64, 142 L.Ed.2d 50 (1998), holds that the cap applies per plaintiff, per suit (rather than per claim), but she asks us to disapprove *Hudson* and create a conflict among the circuits. (No other court of appeals has dealt with the question.)

■ Section 1981a(b)(3) provides:

The sum of the amount of compensatory damages awarded ... for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

(B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and

(C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

Subsection (D) applies because the School Board has substantially more than 500 employees. *Hudson* observes that the cap is expressed as a maximum recovery "for each complaining party" and concludes that this language means what it says. 130 F.3d at 1199–1200. Smith points to legislative history suggesting that the reference to "each complaining party" was designed to ensure that aggregate recoveries in class actions were not limited to the sums appropriate for one-plaintiff suits. Let us grant that this was the origin of the language; still, statutory words often have effects in addition to those contemplated by their authors. The language in question well serves the end of permitting each class member to receive compensatory damages up to the single-party limit; but it *also* sets a single-*party* limit rather than a single-*claim* limit. The unit of accounting is the litigant, not the legal theory, which not even deconstructionists could deny. *Hudson* is right; we endorse its conclusion. (Dicta in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 1997, 141 L.Ed.2d 277 (1998), are to the same effect.)

Now this approach could lead victims of discrimination to file multiple suits, asserting that in light of our holding the more suits the greater the maximum recovery. Nothing in § 1981a(b)(3) interdicts this strategy—but the law of claim preclusion may do so. Litigants may not split into multiple packages different claims arising out of the same transaction. As a rule, the first to go to judgment also is the last. Sometimes it will be hard to determine just what falls within the bounds of a single "transaction" and therefore must be pursued in a single suit, see *Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223 (7th Cir.1993); *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320 (7th Cir.1992); *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589 (7th Cir.1986), but usually the boundaries are clear enough. Multiple discriminatory transactions or episodes may be pursued in multiple suits and yield cumulative recoveries; but multiple claims in a single suit (even if based on multiple transactions) may not. That's somewhat awkward, but it makes sense of the statutory language and discourages efforts to evade the ceiling (for these efforts may lead to complete failure of all suits after the first). Permitting cumulative awards in a single suit, by contrast, would induce creative pleading; the legal mind can depict even an auto accident as a violation of RICO in addition to a tort (rare is the civil pleading that

does not contain four or five "claims" or "counts" that boil down to slightly different characterizations of the same events). Is each racial slur a "claim" that can support its own $300,000 award? If so, the cap is ineffectual; but if not, where shall the line be drawn? The same-transaction rule developed in the law of preclusion holds out more prospect of giving a practical answer to that question than does any other approach we can envisage. It permits persons who have been victimized multiple times (and separately injured by each discriminatory episode) to recover more than persons who have suffered only once, which is as it should be; but it also recognizes that a single discriminatory "transaction" may include many nasty events (a single slur is not even actionable under Title VII).

 The judge to whom this case will be reassigned on remand (see Circuit Rule 36) will need to revisit the question whether many of the acts complained of are within the statute of limitations for Title VII claims. Smith filed multiple charges, and it is not easy to sort out which charges comprise which events. Judge Holderman originally thought many of the claims time-barred but changed his mind; the new judge should take a fresh look at the subject. The last dispute that demands resolution before remand arises from Smith's claim under the Illinois Human Rights Act. Illinois permits litigation in common-law fashion of contentions that one party intentionally inflicted emotional distress on another; but if the distressing incidents reflected racial (or other) discrimination, the claim must be presented to the Illinois Human Rights Commission rather than to a court. See *Maksimovic v. Tsogalis*, 177 Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21 (1997); *Geise v. Phoenix Co.*, 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273 (1994). Recovery on a state-law claim of the intentional infliction of emotional distress might entitle Smith to compensatory damages exceeding $300,000. After trial, however, the district court dismissed this claim, ruling that Smith had pitched her entire case on the theory that she is a victim of *racial* harassment and retaliation, and thus had established that the Illinois Human Rights Commission was the only proper forum for her

state-law theories. *Maksimovic* holds that torts independent of any civil-rights claims remain subject to judicial rather than administrative adjudication, but like the district court we think it clear that Smith's state-law theories sound primarily in racial discrimination and thus are not independent of civil rights law. Racial discrimination was not "merely incidental" to a mundane tort, as in *Maksimovic*, 227 Ill.Dec. 98, 687 N.E.2d at 23; it is the core of Smith's theory. Thus only the Title VII theory remains for decision in this case.

REVERSED AND REMANDED.