EDITH BROWN CLEMENT, Circuit Judge:
Carleen Black sued her former employer, Pamlab, alleging various sex discrimination claims and a retaliatory termination claim under Title VII, 42 U.S.C. § 2000e et seq., and the Texas Commission on Human Rights Act (TCHRA), Texas Lab.Code §§ 21.001-21.556. A jury rendered a verdict in Black’s favor and awarded her $3,450,000 in back pay and compensatory and punitive damages. Applying Title VII’s damages cap, the district court reduced the jury’s award to a total of $500,000, representing $300,000 in back pay and $200,000 in compensatory and punitive damages. Pamlab appeals, arguing that there was insufficient evidence to support the jury’s liability and punitive damages findings. Black cross-appeals, arguing that the district court erred in its application of Title VIPs damages cap. For the reasons set forth below, we AF *257 FIRM the jury’s verdict and the district court’s application of Title VII’s damages cap. We REVERSE in part the jury’s back pay award and REMAND for recalculation.

I. Facts and Proceedings

Black worked as a sales representative for Pamlab, a pharmaceutical company, from February 2003 until her employment was terminated in April 2006. As a sales representative, Black’s job was to meet with physicians and pharmacists and to convince them to prescribe or stock Pam-lab’s products. Each Pamlab sales representative is responsible for making office visits within an assigned geographic sales territory.
From the beginning of her employment until June 2005, Black was assigned a territory covering a large portion of Las Vegas, Nevada. Pamlab had split the Las Vegas area into two sales territories along 1-15, resulting in an eastern territory and a western territory. Black was assigned the eastern territory while Shane Livingston (“Livingston”), a male sales representative, covered the western territory. Livingston began working the Las Vegas area approximately three months before Black and departed in the latter part of 2004.
Black testified that when she first started at Pamlab she was told by Pamlab’s management that she would not have a sales quota. Approximately 120 days after she began at Pamlab, however, she received a sales quota. Livingston was also told that he would not have a sales quota, but he also received a quota. It is undisputed that, from February 2003 to the end of 2004, Black’s sales quota was higher than Livingston’s. Black complained to her supervisor about her quota, who directed her complaints to Stephen Camp, Pamlab’s Vice-President of Sales and Marketing. Black testified that, when she complained to Stephen Camp, he replied that the quota “shouldn’t matter to you, [because] you’re not the breadwinner anyway.”
In June 2004, Black notified Pamlab that she planned to move to Texas the following summer. In order to keep Black at the company, Pamlab offered her a sales representative position in San Antonio, Texas, which Black accepted. In June 2005, Black began working in Texas, reporting to district manager Jody Redding.
In April 2006, Black attended Pamlab’s National Sales Meeting, a week-long annual event held in Orlando, Florida. During this convention, Black failed to appear when her name was called for an award at a banquet and failed to attend a “send off’ breakfast the following morning. The following week, Barry LeBlanc (Pamlab’s CEO), Samuel Camp (Pamlab’s President), Stephen Camp, Tracy Johnson (Pamlab’s Director of Sales for the Western United States), and Lee Ingles (Pamlab’s Human Resources Director) met and decided to terminate Black. On April 14, 2006, Pam-lab terminated Black’s employment. Ingles testified that Black was terminated for missing meetings at the National Sales Meeting and for complaining about her sales territory.
Throughout her tenure at Pamlab, Black had objected to a number of sexually charged comments made by Pamlab’s management to her or in her presence. Black testified that Samuel Camp, Johnson, and Redding had made sexually explicit comments about various parts of Black’s body.[1] Black also testified that *258 Redding requested to go back with her to her hotel room at a national sales meeting. Black made informal complaints about these comments to her supervisors (who were also the individuals who made the comments).
Following her termination, Black filed suit in Texas state court under Title VII and the TCHRA, alleging that: (1) Pamlab discriminated against her on the basis of gender in assigning her sales quota (“quota claim”); (2) Pamlab discriminated against her on the basis of sex by terminating her (“termination claim”); and (3) Pamlab retaliated against her for making complaints regarding its discriminatory activities by terminating her (“retaliation claim”). Pamlab removed the case to federal court and the case proceeded to a jury trial.[2] After Black presented her case-in-chief, Pamlab moved for judgment as a matter of law (“JMOL”), which the district court denied. The jury returned a verdict in Black’s favor on all three discrimination claims. It awarded Black: (1) $200,000 in compensatory damages for each claim; (2) $150,000 in back pay for each claim; and (3) a total of $2,400,000 in punitive damages.
After trial, Pamlab renewed its JMOL motion, which the district court again denied. Pamlab also filed a motion for remittitur, which the court granted in part. Because the jury’s verdict resulted in double recovery of back pay resulting from Black’s termination, the court reduced the $300,000 in total back pay awards for her termination and retaliation claims to $150,000. It then reduced Black’s total compensatory/punitive damages award to $200,000 pursuant to Title VII’s and the TCHRA’s damages cap.[3] See 42 U.S.C. § 1981a(b)(3); Tex. Lab.Code § 21.2585(d). Pamlab timely appeals and Black cross-appeals.

II. Standard of Review

We review the district court’s denial of a renewed JMOL motion de novo. Perez v. Tex. Dep’t of Crim. Justice, 395 F.3d 206, 215 (5th Cir.2004). When reviewing jury verdicts, the court views all the evidence and draws all reasonable inferences in the light most favorable to the verdict. Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 301 (5th Cir.2000). If “the facts and inferences point so strongly in favor of [Pamlab] that a rational jury could not arrive at a contrary verdict,” then Pamlab’s JMOL motion should be granted. Waymire v. Harris Cnty., 86 F.3d 424, 427 (5th Cir.1996) (quotation omitted).
“The decision to grant or deny a motion for ... remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse.” Consol. Cos. v. Lexington Ins. Co., 616 F.3d 422, 435 (5th Cir.2010) (quotation omitted). “A trial court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment *259 of the evidence.” United States v. Caldwell, 586 F.3d 338, 341 (5th Cir.2009).

III. Discussion

Pamlab argues that the district court erred in denying its renewed JMOL because there was insufficient evidence to support the jury’s findings of liability on the quota, termination, and retaliation claims. It also argues that the evidence did not support either the jury’s $150,000 back pay award for the quota claim or the jury’s punitive damages award for all claims. Black cross-appeals the district court’s application of Title VIPs damages cap to her award.

A. Whether Black presented sufficient evidence to support the jury verdict on her termination claim.

Pamlab argues that there was insufficient evidence to support the jury’s finding that it discriminated against Black on the basis of sex when it terminated her in 2006.
To establish a prima facie case of discrimination under Title VII and the TCHRA, a plaintiff must show that: “(1) the plaintiff is a member of a protected group; (2) the plaintiff was qualified for the job that was held; (3) the plaintiff was discharged; and (4) after the employer discharged the plaintiff, the employer filled the position with a person who is not a member of a protected group.” Valdez v. San Antonio Chamber of Commerce, 974 F.2d 592, 596 (5th Cir.1992). After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action. McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir.2007). The employer’s burden is one of production, not persuasion, and does not involve a credibility assessment. Id. at 559. The burden then shifts back to the plaintiff to show either: “(1) that the defendant’s reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant’s reason, while true, is only one of the reasons for its conduct, and another ‘motivating factor’ is the plaintiffs protected characteristic (mixed-motive[s] alternative).” Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir.2004) (alteration in original); see also Smith v. Xerox Corp., 602 F.3d 320, 326 (5th Cir.2010). Under the pretext alternative, the plaintiff “bears the ultimate burden of proving that the employer’s proffered reason is not true but instead is a pretext for the real discriminatory ... purpose. To carry this burden, the plaintiff must rebut each nondiscriminatory ... reason articulated by the employer.” McCoy, 492 F.3d at 557. Under the mixed-motive alternative, if the plaintiff shows that the plaintiffs protected characteristic was a motivating factor, then the burden shifts to the employer to show that the adverse employment decision would have been made regardless of the characteristic. See Rachid, 376 F.3d at 312.
But because this ease has been fully tried on the merits, we “need not address the sufficiency of [Black’s] prima facie case, and may instead proceed directly to the ultimate question of whether [Black] ha[s] produced sufficient evidence for a jury to find that discrimination has occurred.” Wyvill, 212 F.3d at 301; see also, e.g., Palasota v. Haggar Clothing Co., 342 F.3d 569, 574 (5th Cir.2003) (“Where a case has been fully tried ... the panel should examine whether the plaintiff has met his ultimate burden of proving that the employer terminated him because of age.”). The jury stated in its verdict form that it found “from the preponderance of the evidence that Carleen Black’s sex was a motivating factor in Pamlab’s decision to terminate her employment.” The issue *260 before the court is therefore whether Black produced sufficient evidence for a jury to conclude that her sex was a motivating factor in Pamlab’s decision to fire her. Id.
We conclude that there was ample evidence to support the jury’s finding of sex discrimination. Black presented evidence that several Pamlab management members who were party to the decision to terminate her had previously made sexist comments. Black testified that Samuel Camp told her that women were a detriment to the company and that Black had taken a position from a male. He also stated his concern that women “get hired on, get married, and/or get pregnant and they leave.” Stephen Camp made similarly charged comments when he stated that Black did not need to worry about her quota because she was not the “breadwinner anyway.” Johnson and Stephen Camp also made a considerable number of sexually inappropriate comments about Black’s body and what it would be like to have sex with her. Black also presented evidence that her immediate supervisors made sexist comments. Redding made inappropriate comments about Black’s body and propositioned her at a national sales meeting. Gary Waters — Redding’s direct boss — told Black that he did not want a female in his region.
In sum, there was ample evidence by which the jury could conclude that Pamlab had a corporate culture hostile to women, that this discriminatory animus extended to Pamlab’s management, and that Black’s sex was a motivating factor in Pamlab’s decision to terminate her.[4] Under the weight of this evidence, we conclude that Pamlab has not met its burden of showing that a “rational jury could not arrive” at a verdict in Black’s favor. The district court did not err in denying Pamlab’s JMOL on Black’s discrimination termination claim.
We next turn to the jury’s damages award. Under Title VII, a jury may award a prevailing plaintiff compensatory and punitive damages. 42 U.S.C. § 1981a(a). Here, the jury awarded Black $200,000 in compensatory damages for her termination claim. As discussed above, Black presented sufficient evidence to support the jury verdict in her favor on her termination claim; she was therefore eligible for a compensatory damage award. Pamlab does not contest the amount that the jury awarded Black in compensatory damages on this claim. We therefore affirm the jury’s $200,000 compensatory damages award for Black’s termination claim.
Further, as we hold below, Title VII’s damages cap limits Black’s recovery to $200,000 in total compensatory and punitive damages for all of her claims. See 42 U.S.C. § 1981a(b). Black’s compensatory damages award for her termination claim reaches this limit. The damages cap therefore moots Pamlab’s arguments regarding whether sufficient evidence supported punitive damages for Black’s claims.
Under Title VII, a jury may also award a prevailing plaintiff back pay. 42 U.S.C. § 2000e-5(g)(l). Here, the jury awarded Black $150,000 in back pay for her termination claim. Pamlab does not contest this award. We therefore affirm the jury’s $150,000 back pay award for Black’s termination claim.
*261 In addition, as the district court correctly held, the Supreme Court’s prohibition on double recovery prevents Black from recovering back pay for both her termination claim and her retaliation claim. EEOC v. Waffle House, Inc., 534 U.S. 279, 297, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (“[I]t goes without saying that the courts can and should preclude double recovery by an individual.” (quotation omitted)). Because Black could not recover additional back pay or compensatory damages for her retaliation claim, our holding on her termination claim moots Pamlab’s arguments as to that claim as well.

B. Whether Black presented, sufficient evidence to support the jury verdict on her quota claim.

Pamlab argues that Black did not present sufficient evidence to support the jury verdict on her quota claim. It argues that the evidence does not support any of the three theories Black presented at trial supporting her quota claim: (1) that Black was the only sales representative at Pam-lab with a sales quota on Pamlab’s Foltx product (“Exclusive Quota Theory”); (2) that Pamlab promised her that she would have no sales quota at all but later gave her a quota as an act of discrimination (“Zero Quota Theory”); and (3) that Livingston, a male Las Vegas-based sales representative, had a lower sales quota than Black (“Disparate Treatment Theory”).
We decline to address whether the evidence supports an Exclusive Quota Theory or a Zero Quota Theory because Black did not advance these theories of recovery at trial. The precise issue presented to the jury was whether “Pamlab discriminated against [Black] on the basis of her sex ... by giving her a higher sales quota than a similarly situated male employee.” To prevail on this claim, the jury was required to find that “Pamlab gave [Black] a higher sales quota than a similarly situated male employee.” Thus, the only quota theory about which the jury was instructed was the Disparate Impact Theory. Further, Black’s counsel did not present a Zero Quota Theory or an Exclusive Quota Theory, either in the proposed jury instructions or during closing argument.[5] In summarizing Black’s quota claim during closing argument, Black’s counsel argued that Pamlab’s proffered non-discriminatory method for setting quotas was pretextual and that “they arbitrarily, because she’s a woman, ... assigned her a higher sales quota thinking she would fail, only she didn’t .... [S]he had a higher quota than any employee out there.” Counsel then repeated the instructions given to the jurors, urging them to impose liability on Pamlab by finding that they “gave Carleen Black a higher sales quota than a similarly situated male employee.”
The dissent errs by making arguments on Black’s behalf which her own lawyers failed to pursue at trial.[6] Thus, even if the *262 dissent is correct that “[t]here are many ways to prove that an employment decision was discriminatory” and that “comparator evidence is not necessary,” Dissent Op. at 279, the instructions here required it. Accordingly, we decline the invitation to validate a theory of recovery abandoned at trial. Cf. Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr., 425 F.3d 126, 138 (2d Cir.2005) (declining to consider argument on alternate theory of negligence because “the abandonment of a theory of recovery is a decision well within the normal range of strategic trial decisions and does not prevent a jury from reaching a rational conclusion.”); Galena v. Leone, 638 F.3d 186, 201-02 (3d Cir.2011) (party waived arguments related to a theory not presented to the jury at trial, where that party failed to request the court to present them in the instructions and failed to object to their not having been presented); see also Saucier v. Plummer, 611 F.3d 286, 288 (5th Cir.2010) (holding that plaintiff “cannot recover damages that she asked the jury not to award.”).
Even assuming arguendo that the Zero Quota Theory is not waived, we cannot ignore the jury instructions, which explicitly tethered the issue to “a similarly situated male employee” and which Black does not challenge on appeal. In light of this, Black’s testimony that Livingston, her proffered male comparator, had also been told that he would not have a quota but was still given a quota is highly relevant. And because Black offered no evidence of another comparator who was given a promise of a zero quota and was given no quota, there was insufficient evidence to support a Zero Quota Theory based on the instructions to the jury.
The record does, however, support the jury’s discrimination verdict under Black’s Disparate Treatment Theory. In order to establish a claim of disparate treatment, Black must show that she was treated differently than Livingston “under nearly identical circumstances.” Wyvill, 212 F.3d at 304. “The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.” Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 260 (5th Cir.2009). If, however, a difference between Black and Livingston “accounts for the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis.” Id. (citation omitted) (emphasis in original).
It is undisputed that Livingston and Black both: (1) had the same job (pharmaceutical sales representative), (2) worked for Pamlab, (3) reported to the same supervisors, and (4) sold at least some of the same drugs/pharmaceutieal products. Pamlab acknowledges the similarities between Black and Livingston, but argues that differences in Black’s and Livingston’s territories and sales histories accounted for the different quotas. To support its argument, Pamlab presented the testimony of Bruce Holt, Pamlab’s Director of Sales Information and Analytics, who stated that he set the quotas. Holt testified that a “group of zip codes defines a territory” and that quotas were based on the prior sales in each respective territory. Holt indicated that since there were preexisting sales in Black’s Las Vegas territory, a quota based on those sales would be associated with that territory. Moreover, since the Las Vegas two territories were “totally ... different” and had different *263 levels of sales, he would “expect them to have different quotas.”
Pamlab’s argument fails because, viewing the evidence in the light most favorable to the verdict, a jury could conclude that the differences in Black’s and Livingston’s territories did not account for their different quotas. Although Holt testified that he alone set the quotas, Black presented testimony that Stephen Camp had a role in setting the quotas. Lance Whatley, national account manager for Pamlab, testified that quotas were set by Stephen Camp and Holt. Holt also testified that he had the authority to change a quota if the Camps “so deemed.” As detailed above, Black presented evidence showing that Stephen Camp made a number of sexist comments to her. Under our very deferential standard of review, there was sufficient evidence for the jury to conclude that Black’s higher sales quota was motivated, at least in part, by her gender. The district court did not err in denying Pamlab’s JMOL on Black’s quota claim.
Although there was sufficient evidence to support the jury’s verdict as to liability on the quota claim, there was insufficient evidence to support its back pay award. Because Black only presented sufficient evidence to prevail under her Disparate Treatment Theory, she is only entitled to back pay equal to the difference between her actual commissions and the commissions that she would have earned with Livingston’s quota. The jury’s award of $150,000, however, was calculated based on the difference between Black’s actual commissions and what her commissions would have been if she had zero quota. On remand, the district court should calculate a proper back pay award based on what Black’s commission would have been if she would have had Livingston’s quota. “Because back pay is an equitable remedy, the district court need not empanel an advisory jury but can decide the back pay issue itself absent the parties’ agreement to the correct amount.” West v. Nabors Drilling USA, Inc., 330 F.3d 379, 394-95 (5th Cir.2003) (internal quotation and citations omitted).

C. Whether the district court erred in applying Title VII’s compensatory and punitive damages cap.

Title VII caps compensatory and punitive damages awards at $200,000. See 42 U.S.C. § 1981a(b)(3)(C). Following Title VII’s damages cap, the district court reduced the jury’s award of $600,000 in compensatory damages and $2.4 million in punitive damages to a total of $200,000. In her cross-appeal, Black argues that the district court abused its discretion in applying Title VII’s damages cap to her entire compensatory and punitive damages award as opposed to capping each claim at $200,000, for a total of $600,000. She argues that she suffered two kinds of harms — harm flowing from “discrimination that did not result in termination” and harm flowing from “discrimination that did directly result from” her termination— such that she will not obtain a double recovery if given separate awards for each claim. She also argues that the court should have applied the cap on a per-claim basis because her three claims “are separate, distinct and independent causes of action — each of which could have been brought on its own.”
In relevant part, 42 U.S.C. § 1981a(a)(l) states that “[i]n an action brought by a complaining party [under Title VII] ... the complaining party may recover compensatory and punitive damages.” However, “[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental ang-uish, loss of enjoyment *264 of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party ... $200,000.” 42 U.S.C. § 1981a(b)(3).
This issue is one of first impression in the Fifth Circuit. However, several of our sister circuits have addressed the issue of whether Title VII’s damages cap applies on a “per claim” or a “per party” basis. In Hudson v. Reno, the Sixth Circuit held that the plain language of the statute dictated applying the cap on a “per party” basis:
Under the plain language of the statute, the cap on compensatory damages applies to each complaining party in an “action”. An “action” is simply a “lawsuit brought in court.” Similarly, the Federal Rules of Civil Procedure use the term “action” or “civil action” to describe all claims for relief alleged in a single lawsuit. Put simply, the § 1981a caps apply to each party in an action, not to each claim, and there is nothing in the language of the statute to indicate otherwise. The face of the statute is conclusive and this is the reading of it that the Court must apply.
130 F.3d 1193, 1200 (6th Cir.1997) (internal citations omitted), abrogated on other grounds, Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 847-48, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). Other courts have uniformly held that Title VII’s damages cap applies to each party in an action, not to each claim. See Fogg v. Ashcroft, 254 F.3d 103, 106-08 (D.C.Cir.2001); Smith v. Chi. Sch. Reform Bd. of Trs., 165 F.3d 1142, 1150 (7th Cir.1999) (agreeing with Sixth Circuit’s holding that “the cap applies per plaintiff, per suit (rather than per claim)”); Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1245-46 (10th Cir. 1999) (same).
We find the reasoning of our sister circuits compelling and hold that the plain language of § 1981a(b)’s cap applies to each party in an action. Because the plain meaning of the statute dictates this result, we need not address Black’s other arguments in support of her reading of the statute. Dunn-McCampbell Royalty Interest, Inc. v. Nat’l Park Serv., 630 F.3d 431, 438 (5th Cir.2011) (“[W]hen the plain language of a statute is unambiguous and does not lead to an absurd result, our inquiry begins and ends with the plain meaning of that language.” (quotation omitted)). For the purposes of Title VII’s damages cap, the relevant “unit of accounting is the litigant, not the legal theory.” Smith, 165 F.3d at 1150. Because the district court reduced Black’s damages based on a correct interpretation of § 1981a, it did not err in reducing Black’s damages.

IV. Conclusion

For the foregoing reasons, the jury’s $150,000 back pay award for Black’s quota claim is REVERSED and REMANDED for recalculation. The remainder of district court’s judgment is AFFIRMED.

. Specifically, Black testified that, during a training session where he was role-playing a doctor client, Johnson stated: "I don't care what you're selling. I’ll buy it[] because I can’t keep my eyes off your boobs.” Black also heard Redding tell another male employ *258 ee that “he wanted to know what it was like to touch [Black’s] breasts.” Another witness testified that Samuel Camp stated that Black’s body was "rocking and hot but her face doesn’t match her body.”

. Black also raised a hostile-work environment claim, an intentional infliction of emotional distress claim, and other theories of discrimination. The district court entered a pre-trial order that Black take nothing on these claims. Black does not appeal this pretrial order.

. Although Title VII and the TCHRA contain independent damages cap provisions, we have previously held that we view the two caps as coextensive, not cumulative. Giles v. Gen. Elec. Co., 245 F.3d 474, 492 (5th Cir.2001).

. Pamlab’s assertion that it is entitled to the "same actor” inference because Stephen Camp had hired Black does not undermine this conclusion, since a number of individuals were involved in the decision to terminate her. Lee Ingles, Stephen Camp, Samuel Camp, Tracy Johnson, and Barry LeBlanc were involved in the meeting where the decision to terminate Black was made.

. We note that even if the jury was instructed on an Exclusive Quota Theory, Pamlab presented undisputed evidence that other sales representatives had Foltx quotas. The evidence was thus insufficient to support an Exclusive Quota Theory.

. Although Pamlab refers to a “zero-quota Quota Claim” by Black in its Renewed Motion for Judgment as a Matter of Law and appellate briefs, our review of the trial transcript shows that Black never presented such a claim at trial. Black's complaint alleged that “when Ms. Black was in Las Vegas, her partner’s salary was considerably higher than Ms. Black's salary; he had less of a required quota.” Further, Black argued at trial that judgment as a matter of law was inappropriate because she had shown that she was “treated differently from a similarly situated employee,” Shane Livingston. Pamlab's misunderstanding of Black's argument does not change the fact that Black waived any Title VII claim based on a Zero-Quota Theory.