REVISED July 12, 2011

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 11, 2011

Lyle W. Cayce
Clerk

No. 09-51092

CARLEEN BLACK

                              Plaintiff - Appellee Cross-Appellant

v.

PAN AMERICAN LABORATORIES, L.L.C.; PAMLAB, L.L.C.

                              Defendants - Appellants Cross-
                              Appellees

Appeals from the United States District Court
for the Western District of Texas

Before JONES, Chief Judge, and DENNIS and CLEMENT, Circuit Judges.
EDITH BROWN CLEMENT, Circuit Judge:

Carleen Black sued her former employer, Pamlab, alleging various sex discrimination claims and a retaliatory termination claim under Title VII, 42 U.S.C. § 2000e et seq., and the Texas Commission on Human Rights Act (TCHRA), TEXAS LAB. CODE §§ 21.001-21.556. A jury rendered a verdict in Black's favor and awarded her $3,450,000 in back pay and compensatory and punitive damages. Applying Title VII's damages cap, the district court reduced the jury's award to a total of $500,000, representing $300,000 in back pay and $200,000 in compensatory and punitive damages. Pamlab appeals, arguing that

there was insufficient evidence to support the jury's liability and punitive damages findings. Black cross-appeals, arguing that the district court erred in its application of Title VII's damages cap. For the reasons set forth below, we AFFIRM the jury's verdict and the district court's application of Title VII's damages cap. We REVERSE in part the jury's back pay award and REMAND for recalculation.

I.    Facts and Proceedings

Black worked as a sales representative for Pamlab, a pharmaceutical company, from February 2003 until her employment was terminated in April 2006. As a sales representative, Black's job was to meet with physicians and pharmacists and to convince them to prescribe or stock Pamlab's products. Each Pamlab sales representative is responsible for making office visits within an assigned geographic sales territory.

From the beginning of her employment until June 2005, Black was assigned a territory covering a large portion of Las Vegas, Nevada. Pamlab had split the Las Vegas area into two sales territories along I-15, resulting in an eastern territory and a western territory. Black was assigned the eastern territory while Shane Livingston ("Livingston"), a male sales representative, covered the western territory. Livingston began working the Las Vegas area approximately three months before Black and departed in the latter part of 2004.

Black testified that when she first started at Pamlab she was told by Pamlab's management that she would not have a sales quota. Approximately 120 days after she began at Pamlab, however, she received a sales quota. Livingston was also told that he would not have a sales quota, but he also received a quota. It is undisputed that, from February 2003 to the end of 2004, Black's sales quota was higher than Livingston's. Black complained to her supervisor about her quota, who directed her complaints to Stephen Camp,

Pamlab's Vice-President of Sales and Marketing. Black testified that, when she complained to Stephen Camp, he replied that the quota "shouldn't matter to you, [because] you're not the breadwinner anyway."

In June 2004, Black notified Pamlab that she planned to move to Texas the following summer. In order to keep Black at the company, Pamlab offered her a sales representative position in San Antonio, Texas, which Black accepted. In June 2005, Black began working in Texas, reporting to district manager Jody Redding.

In April 2006, Black attended Pamlab's National Sales Meeting, a week-long annual event held in Orlando, Florida. During this convention, Black failed to appear when her name was called for an award at a banquet and failed to attend a "send off" breakfast the following morning. The following week, Barry LeBlanc (Pamlab's CEO), Samuel Camp (Pamlab's President), Stephen Camp, Tracy Johnson (Pamlab's Director of Sales for the Western United States), and Lee Ingles (Pamlab's Human Resources Director) met and decided to terminate Black. On April 14, 2006, Pamlab terminated Black's employment. Ingles testified that Black was terminated for missing meetings at the National Sales Meeting and for complaining about her sales territory.

Throughout her tenure at Pamlab, Black had objected to a number of sexually charged comments made by Pamlab's management to her or in her presence. Black testified that Samuel Camp, Johnson, and Redding had made sexually explicit comments about various parts of Black's body.[1] Black also testified that Redding requested to go back with her to her hotel room at a

---

[1] Specifically, Black testified that, during a training session where he was role-playing a doctor client, Johnson stated: "I don't care what you're selling. I'll buy it[] because I can't keep my eyes off your boobs." Black also heard Redding tell another male employee that "he wanted to know what it was like to touch [Black's] breasts." Another witness testified that Samuel Camp stated that Black's body was "rocking and hot but her face doesn't match her body."

national sales meeting. Black made informal complaints about these comments to her supervisors (who were also the individuals who made the comments).

Following her termination, Black filed suit in Texas state court under Title VII and the TCHRA, alleging that: (1) Pamlab discriminated against her on the basis of gender in assigning her sales quota ("quota claim"); (2) Pamlab discriminated against her on the basis of sex by terminating her ("termination claim"); and (3) Pamlab retaliated against her for making complaints regarding its discriminatory activities by terminating her ("retaliation claim"). Pamlab removed the case to federal court and the case proceeded to a jury trial.[2] After Black presented her case-in-chief, Pamlab moved for judgment as a matter of law ("JMOL"), which the district court denied. The jury returned a verdict in Black's favor on all three discrimination claims. It awarded Black: (1) $200,000 in compensatory damages for each claim; (2) $150,000 in back pay for each claim; and (3) a total of $2,400,000 in punitive damages.

After trial, Pamlab renewed its JMOL motion, which the district court again denied. Pamlab also filed a motion for remittitur, which the court granted in part. Because the jury's verdict resulted in double recovery of back pay resulting from Black's termination, the court reduced the $300,000 in total back pay awards for her termination and retaliation claims to $150,000. It then reduced Black's total compensatory/punitive damages award to $200,000 pursuant to Title VII's and the TCHRA's damages cap.[3] See 42 U.S.C. § 1981a)(b)(3); TEX. LAB. CODE § 21.2585(d). Pamlab timely appeals and Black cross-appeals.

---

[2] Black also raised a hostile-work environment claim, an intentional infliction of emotional distress claim, and other theories of discrimination. The district court entered a pre-trial order that Black take nothing on these claims. Black does not appeal this pre-trial order.

[3] Although Title VII and the TCHRA contain independent damages cap provisions, we have previously held that we view the two caps as coextensive, not cumulative. Giles v. Gen. Elec. Co., 245 F.3d 474, 492 (5th Cir. 2001).

II. Standard of Review

We review the district court's denial of a renewed JMOL motion de novo. Perez v. Tex. Dep't of Crim. Justice, 395 F.3d 206, 215 (5th Cir. 2004). When reviewing jury verdicts, the court views all the evidence and draws all reasonable inferences in the light most favorable to the verdict. Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 301 (5th Cir. 2000). If "the facts and inferences point so strongly in favor of [Pamlab] that a rational jury could not arrive at a contrary verdict," then Pamlab's JMOL motion should be granted. Waymire v. Harris Cnty., 86 F.3d 424, 427 (5th Cir. 1996) (quotation omitted).

"The decision to grant or deny a motion for . . . remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse." Consol. Cos. v. Lexington Ins. Co., 616 F.3d 422, 435 (5th Cir. 2010) (quotation omitted). "A trial court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the evidence." United States v. Caldwell, 586 F.3d 338, 341 (5th Cir. 2009).

III. Discussion

Pamlab argues that the district court erred in denying its renewed JMOL because there was insufficient evidence to support the jury's findings of liability on the quota, termination, and retaliation claims. It also argues that the evidence did not support either the jury's $150,000 back pay award for the quota claim or the jury's punitive damages award for all claims. Black cross-appeals the district court's application of Title VII's damages cap to her award.

A. Whether Black presented sufficient evidence to support the jury verdict on her termination claim.

Pamlab argues that there was insufficient evidence to support the jury's finding that it discriminated against Black on the basis of sex when it terminated her in 2006.

To establish a prima facie case of discrimination under Title VII and the TCHRA, a plaintiff must show that: "(1) the plaintiff is a member of a protected group; (2) the plaintiff was qualified for the job that was held; (3) the plaintiff was discharged; and (4) after the employer discharged the plaintiff, the employer filled the position with a person who is not a member of a protected group." Valdez v. San Antonio Chamber of Commerce, 974 F.2d 592, 596 (5th Cir. 1992). After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action. McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007). The employer's burden is one of production, not persuasion, and does not involve a credibility assessment. Id. at 559. The burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004) (alteration in original); see also Smith v. Xerox Corp., 602 F.3d 320, 326 (5th Cir. 2010). Under the pretext alternative, the plaintiff "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose. To carry this burden, the plaintiff must rebut each nondiscriminatory . . . reason articulated by the employer." McCoy, 492 F.3d at 557. Under the mixed-motive alternative, if the plaintiff shows that the plaintiff's protected characteristic was a motivating factor, then the burden shifts to the employer to show that the adverse employment decision would have been made regardless of the characteristic. See Rachid, 376 F.3d at 312.

But because this case has been fully tried on the merits, we "need not address the sufficiency of [Black's] prima facie case, and may instead proceed

directly to the ultimate question of whether [Black] ha[s] produced sufficient evidence for a jury to find that discrimination has occurred." Wyvill, 212 F.3d at 301; see also, e.g., Palasota v. Haggar Clothing Co., 342 F.3d 569, 574 (5th Cir. 2003) ("Where a case has been fully tried . . . the panel should examine whether the plaintiff has met his ultimate burden of proving that the employer terminated him because of age."). The jury stated in its verdict form that it found "from the preponderance of the evidence that Carleen Black's sex was a motivating factor in Pamlab's decision to terminate her employment." The issue before the court is therefore whether Black produced sufficient evidence for a jury to conclude that her sex was a motivating factor in Pamlab's decision to fire her. Id.

We conclude that there was ample evidence to support the jury's finding of sex discrimination. Black presented evidence that several Pamlab management members who were party to the decision to terminate her had previously made sexist comments. Black testified that Samuel Camp told her that women were a detriment to the company and that Black had taken a position from a male. He also stated his concern that women "get hired on, get married, and/or get pregnant and they leave." Stephen Camp made similarly charged comments when he stated that Black did not need to worry about her quota because she was not the "breadwinner anyway." Johnson and Stephen Camp also made a considerable number of sexually inappropriate comments about Black's body and what it would be like to have sex with her. Black also presented evidence that her immediate supervisors made sexist comments. Redding made inappropriate comments about Black's body and propositioned her at a national sales meeting. Gary Waters–Redding's direct boss–told Black that he did not want a female in his region.

In sum, there was ample evidence by which the jury could conclude that Pamlab had a corporate culture hostile to women, that this discriminatory

animus extended to Pamlab's management, and that Black's sex was a motivating factor in Pamlab's decision to terminate her.[4]   Under the weight of this evidence, we conclude that Pamlab has not met its burden of showing that a "rational jury could not arrive" at a verdict in Black's favor.  The district court did not err in denying Pamlab's JMOL on Black's discrimination termination claim.

We next turn to the jury's damages award.  Under Title VII, a jury may award a prevailing plaintiff compensatory and punitive damages.  42 U.S.C. § 1981a(a).  Here, the jury awarded Black $200,000 in compensatory damages for her termination claim.  As discussed above, Black presented sufficient evidence to support the jury verdict in her favor on her termination claim; she was therefore eligible for a compensatory damage award.  Pamlab does not contest the amount that the jury awarded Black in compensatory damages on this claim. We therefore affirm the jury's $200,000 compensatory damages award for Black's termination claim.

Further, as we hold below, Title VII's damages cap limits Black's recovery to $200,000 in total compensatory and punitive damages for all of her claims. See 42 U.S.C. § 1981a(b).   Black's compensatory damages award for her termination claim reaches this limit.  The damages cap therefore moots Pamlab's arguments regarding whether sufficient evidence supported punitive damages for Black's claims.

Under Title VII, a jury may also award a prevailing plaintiff back pay.  42 U.S.C. § 2000e-5(g)(1).  Here, the jury awarded Black $150,000 in back pay for

---

[4]  Pamlab's assertion that it is entitled to the "same actor" inference because Stephen Camp had hired Black does not undermine this conclusion, since a number of individuals were involved in the decision to terminate her. Lee Ingles, Stephen Camp, Samuel Camp, Tracy Johnson, and Barry LeBlanc were involved in the meeting where the decision to terminate Black was made.

her termination claim. Pamlab does not contest this award. We therefore affirm the jury's $150,000 back pay award for Black's termination claim.

In addition, as the district court correctly held, the Supreme Court's prohibition on double recovery prevents Black from recovering back pay for both her termination claim and her retaliation claim. EEOC v. Waffle House, Inc., 534 U.S. 279, 297 (2002) ("[I]t goes without saying that the courts can and should preclude double recovery by an individual." (quotation omitted)). Because Black could not recover additional back pay or compensatory damages for her retaliation claim, our holding on her termination claim moots Pamlab's arguments as to that claim as well.

B.    Whether Black presented sufficient evidence to support the jury verdict on her quota claim.

Pamlab argues that Black did not present sufficient evidence to support the jury verdict on her quota claim. It argues that the evidence does not support any of the three theories Black presented at trial supporting her quota claim: (1) that Black was the only sales representative at Pamlab with a sales quota on Pamlab's Foltx product ("Exclusive Quota Theory"); (2) that Pamlab promised her that she would have no sales quota at all but later gave her a quota as an act of discrimination ("Zero Quota Theory"); and (3) that Livingston, a male Las Vegas-based sales representative, had a lower sales quota than Black ("Disparate Treatment Theory").

We decline to address whether the evidence supports an Exclusive Quota Theory or a Zero Quota Theory because Black did not advance these theories of recovery at trial. The precise issue presented to the jury was whether "Pamlab discriminated against [Black] on the basis of her sex . . . by giving her a higher sales quota than a similarly situated male employee." To prevail on this claim, the jury was required to find that "Pamlab gave [Black] a higher sales quota than a similarly situated male employee." Thus, the only quota theory about

9

which the jury was instructed was the Disparate Impact Theory. Further, Black's counsel did not present a Zero Quota Theory or an Exclusive Quota Theory, either in the proposed jury instructions or during closing argument.[5] In summarizing Black's quota claim during closing argument, Black's counsel argued that Pamlab's proffered non-discriminatory method for setting quotas was pretextual and that "they arbitrarily, because she's a woman, . . . assigned her a higher sales quota thinking she would fail, only she didn't. . . . [S]he had a higher quota than any employee out there." Counsel then repeated the instructions given to the jurors, urging them to impose liability on Pamlab by finding that they "gave Carleen Black a higher sales quota than a similarly situated male employee."

The dissent errs by making arguments on Black's behalf which her own lawyers failed to pursue at trial.[6] Thus, even if the dissent is correct that "[t]here are many ways to prove that an employment decision was discriminatory" and that "comparator evidence is not necessary," Dissent Op. at 22, the instructions here required it. Accordingly, we decline the invitation to validate a theory of recovery abandoned at trial. Cf. Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr., 425 F.3d 126, 138 (2d Cir. 2005) (declining to consider argument on alternate theory of negligence because

---

[5] We note that even if the jury was instructed on an Exclusive Quota Theory, Pamlab presented undisputed evidence that other sales representatives had Foltx quotas. The evidence was thus insufficient to support an Exclusive Quota Theory.

[6] Although Pamlab refers to a "zero-quota Quota Claim" by Black in its Renewed Motion for Judgment as a Matter of Law and appellate briefs, our review of the trial transcript shows that Black never presented such a claim at trial. Black's complaint alleged that "when Ms Black was in Las Vegas, her partner's salary was considerably higher than Ms. Black's salary; he had less of a required quota." Further, Black argued at trial that judgment as a matter of law was inappropriate because she had shown that she was "treated differently from a similarly situated employee," Shane Livingston. Pamlab's misunderstanding of Black's argument does not change the fact that Black waived any Title VII claim based on a Zero-Quota Theory.

"the abandonment of a theory of recovery is a decision well within the normal range of strategic trial decisions and does not prevent a jury from reaching a rational conclusion."); Galena v. Leone, 638 F.3d 186, 201-02 (3d Cir. 2011) (party waived arguments related to a theory not presented to the jury at trial, where that party failed to request the court to present them in the instructions and failed to object to their not having been presented); see also Saucier v. Plummer, 611 F.3d 286, 288 (5th Cir. 2010) (holding that plaintiff "cannot recover damages that she asked the jury not to award.").

Even assuming arguendo that the Zero Quota Theory is not waived, we cannot ignore the jury instructions, which explicitly tethered the issue to "a similarly situated male employee" and which Black does not challenge on appeal. In light of this, Black's testimony that Livingston, her proffered male comparator, had also been told that he would not have a quota but was still given a quota is highly relevant. And because Black offered no evidence of another comparator who was given a promise of a zero quota and was given no quota, there was insufficient evidence to support a Zero Quota Theory based on the instructions to the jury.

The record does, however, support the jury's discrimination verdict under Black's Disparate Treatment Theory. In order to establish a claim of disparate treatment, Black must show that she was treated differently than Livingston "under nearly identical circumstances." Wyvill, 212 F.3d at 304. "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 260 (5th Cir. 2009). If, however, a difference between Black and Livingston "accounts for the difference in treatment received from the employer, the

employees are not similarly situated for the purposes of an employment discrimination analysis." Id. (citation omitted) (emphasis in original).

It is undisputed that Livingston and Black both: (1) had the same job (pharmaceutical sales representative), (2) worked for Pamlab, (3) reported to the same supervisors, and (4) sold at least some of the same drugs/pharmaceutical products. Pamlab acknowledges the similarities between Black and Livingston, but argues that differences in Black's and Livingston's territories and sales histories accounted for the different quotas. To support its argument, Pamlab presented the testimony of Bruce Holt, Pamlab's Director of Sales Information and Analytics, who stated that he set the quotas. Holt testified that a "group of zip codes defines a territory" and that quotas were based on the prior sales in each respective territory. Holt indicated that since there were pre-existing sales in Black's Las Vegas territory, a quota based on those sales would be associated with that territory. Moreover, since the Las Vegas two territories were "totally . . . different" and had different levels of sales, he would "expect them to have different quotas."

Pamlab's argument fails because, viewing the evidence in the light most favorable to the verdict, a jury could conclude that the differences in Black's and Livingston's territories did not account for their different quotas. Although Holt testified that he alone set the quotas, Black presented testimony that Stephen Camp had a role in setting the quotas. Lance Whatley, national account manager for Pamlab, testified that quotas were set by Stephen Camp and Holt. Holt also testified that he had the authority to change a quota if the Camps "so deemed." As detailed above, Black presented evidence showing that Stephen Camp made a number of sexist comments to her. Under our very deferential standard of review, there was sufficient evidence for the jury to conclude that Black's higher sales quota was motivated, at least in part, by her gender. The district court did not err in denying Pamlab's JMOL on Black's quota claim.

Although there was sufficient evidence to support the jury's verdict as to liability on the quota claim, there was insufficient evidence to support its back pay award. Because Black only presented sufficient evidence to prevail under her Disparate Treatment Theory, she is only entitled to back pay equal to the difference between her actual commissions and the commissions that she would have earned with Livingston's quota. The jury's award of $150,000, however, was calculated based on the difference between Black's actual commissions and what her commissions would have been if she had zero quota. On remand, the district court should calculate a proper back pay award based on what Black's commission would have been if she would have had Livingston's quota. "Because back pay is an equitable remedy, the district court need not empanel an advisory jury but can decide the back pay issue itself absent the parties' agreement to the correct amount." West v. Nabors Drilling USA, Inc., 330 F.3d 379, 394-95 (5th Cir. 2003) (internal quotation and citations omitted).

C.   Whether the district court erred in applying Title VII's compensatory and punitive damages cap.

Title VII caps compensatory and punitive damages awards at $200,000. See 42 U.S.C. § 1981a(b)(3)(C). Following Title VII's damages cap, the district court reduced the jury's award of $600,000 in compensatory damages and $2.4 million in punitive damages to a total of $200,000. In her cross-appeal, Black argues that the district court abused its discretion in applying Title VII's damages cap to her entire compensatory and punitive damages award as opposed to capping each claim at $200,000, for a total of $600,000. She argues that she suffered two kinds of harms—harm flowing from "discrimination that did not result in termination" and harm flowing from "discrimination that did directly result from" her termination—such that she will not obtain a double recovery if given separate awards for each claim. She also argues that the court should have applied the cap on a per-claim basis because her three claims "are

separate, distinct and independent causes of action–each of which could have been brought on its own."

In relevant part, 42 U.S.C. § 1981a(a)(1) states that "[i]n an action brought by a complaining party [under Title VII] . . . the complaining party may recover compensatory and punitive damages." However, "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party . . . $200,000." 42 U.S.C. § 1981a(b)(3).

This issue is one of first impression in the Fifth Circuit. However, several of our sister circuits have addressed the issue of whether Title VII's damages cap applies on a "per claim" or a "per party" basis. In Hudson v. Reno, the Sixth Circuit held that the plain language of the statute dictated applying the cap on a "per party" basis:

> Under the plain language of the statute, the cap on compensatory damages applies to each complaining party in an "action". An "action" is simply a "lawsuit brought in court." Similarly, the Federal Rules of Civil Procedure use the term "action" or "civil action" to describe all claims for relief alleged in a single lawsuit. Put simply, the § 1981a caps apply to each party in an action, not to each claim, and there is nothing in the language of the statute to indicate otherwise. The face of the statute is conclusive and this is the reading of it that the Court must apply.

130 F.3d 1193, 1200 (6th Cir. 1997) (internal citations omitted), abrogated on other grounds, Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 847-48 (2001). Other courts have uniformly held that Title VII's damages cap applies to each party in an action, not to each claim. See Fogg v. Ashcroft, 254 F.3d 103, 106-08 (D.C. Cir. 2001); Smith v. Chi. Sch. Reform Bd. of Trs., 165 F.3d 1142, 1150 (7th Cir. 1999) (agreeing with Sixth Circuit's holding that "the cap applies

per plaintiff, per suit (rather than per claim)"); Baty v. Willamette Indus., Inc., 172 F.3d 1232, 1245-46 (10th Cir. 1999) (same).

We find the reasoning of our sister circuits compelling and hold that the plain language of § 1981a(b)'s cap applies to each party in an action. Because the plain meaning of the statute dictates this result, we need not address Black's other arguments in support of her reading of the statute. Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv., 630 F.3d 431, 438 (5th Cir. 2011) ("[W]hen the plain language of a statute is unambiguous and does not lead to an absurd result, our inquiry begins and ends with the plain meaning of that language." (quotation omitted)). For the purposes of Title VII's damages cap, the relevant "unit of accounting is the litigant, not the legal theory." Smith, 165 F.3d at 1150. Because the district court reduced Black's damages based on a correct interpretation of § 1981a, it did not err in reducing Black's damages.

IV.  Conclusion

For the foregoing reasons, the jury's $150,000 back pay award for Black's quota claim is REVERSED and REMANDED for recalculation. The remainder of district court's judgment is AFFIRMED.

DENNIS, Circuit Judge, dissenting in part and specially concurring in part.

A jury found that Carleen Black's former employer, Pamlab, LLC, discriminated against her on the basis of her sex, in violation of Title VII, by assigning Black a sales quota, which limited the commissions that Pamlab paid her for selling Pamlab's pharmaceutical products. The jury also found that Pamlab would not have made the same decision regarding Black's sales quota in the absence of the impermissible motivating factor of Black's sex. Accordingly, the jury awarded Black back pay for her lost commissions due to the discriminatory sales quota, and the district court sustained that award. Unlike the majority, I would uphold the jury's back pay award also.

It is undisputed that if the evidence was adequate for a reasonable jury to find that Pamlab would not have assigned Black any sales quota, absent discrimination, the back pay award should be sustained. Based on Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), the following two categories of evidence alone are adequate to support this finding: (1) Black established a prima facie case of discrimination, viz., there was direct evidence that the decision to give Black a sales quota was motivated by her sex; and (2) there was sufficient evidence for the jury to disbelieve Pamlab's nondiscriminatory explanation for why it assigned Black a sales quota, viz., that it assigned sales quotas based on a neutral formula derived from prior sales: As Pamlab now concedes, there was evidence that Samuel Camp, Pamlab's President, and his son, Stephen Camp, Pamlab's Vice President of Sales and Marketing, had the authority to adjust sales quotas; also, Pamlab did not explain how its neutral formula led to Black's having a sales quota, and yet, numerous male employees had no sales quotas. Moreover, there was additional evidence that Samuel Camp and Stephen Camp were motivated by sex-based animus and were principally responsible for Black's discriminatory sales quota. On a substantially similar record, the Reeves Court concluded that it was

"apparent" that there was adequate evidence to sustain the jury's finding of discrimination. It is equally apparent here that there was adequate evidence to support a finding that absent discrimination, Black would not have had any sales quota; and it is undisputed that the jury's back pay award should be sustained if there was adequate evidence to support such a finding. Therefore, I respectfully dissent from Part III.B of the majority's opinion, which concludes that the back pay award should be reversed.

Instead of addressing this issue, the majority has decided that neither the district court nor the parties actually understand which theories of discrimination were presented to the jury. The majority argues that Black did not advance at trial the theory that absent discrimination, Pamlab would not have assigned her any sales quota. See Majority Op. at 9-10. However, it is undisputed that Black advanced this theory: Indeed, Pamlab has consistently conceded that Black based her discriminatory quota claim on the fact that she was assigned any sales quota because of her sex.[1] Moreover, Pamlab acknowledges that the district court understood Black to have advanced a no-quota theory when the court upheld the jury's back pay award based on a calculation of the commissions that Black would have received had she been given "quota-less commissions." See Pamlab Br. 19 ("[E]ven the Trial Court's Order denying Pamlab's post-trial motions recognized that [the jury] could arrive

---

[1] See Defs.' Renewed Mot. for J. as a Matter of Law & Alternative Mot. for New Trial 2 ("[Black] first argues that her having a quota in the first place is discriminatory due to the alleged zero-quota promise by Stephen Camp . . . ."); id. at 2-5 (discussing the evidence supporting Black's zero-quota theory); Pamlab's Br. 13 ("Black advanced three theories at trial supporting her quota-based claim discrimination/retaliation claim. Specifically, she testified . . . [that] she should not have had any . . . sales quota whatsoever (her 'Zero-Quota' theory)."); id. 17 ("[Black's] 'zero-quota theory' is based upon an alleged promise Stephen Camp made before Black was hired." (citing R. at 3247, 3259)); Pamlab's Br. 3 ("Black advanced three theories at trial to support her quota-based discrimination/retaliation claim: . . . she should not have had any . . . sales quota whatsoever (her "Zero-Quota" theory)."); id. 3-4 ("The Zero-Quota theory was based on an alleged promise by Stephen Camp that Black would have no quota . . . ." (citing R. at 3247, 3259)).

at a $150,000 number only if it applied 'quota-less commissions.'" (quoting R. at 2647)). There is simply nothing in the record to support the majority's sudden revision of the entire trial.[2] No one can seriously doubt that the zero-quota theory was presented to the jury: One of the central pillars in Black's quota claim was the fact that Pamlab executives promised her that she would not have a sales quota when they hired her, and yet, she was later assigned a sales quota; Pamlab unsuccessfully attempted to persuade the jury in its closing statement to discount the argument that the no-quota promise demonstrated that Black would not have had a sales quota absent discrimination; and the district court, which presided over a three-day trial, recognized Black's zero-quota theory when it sustained the jury's back pay award.

Moreover, the majority's argument—that the jury's finding that "Pamlab gave [Black] a higher sales quota than a similarly situated male employee" can only mean that the jury found that Black's sales quota was discriminatory insofar as it was higher than that of Shane Livingston, a male Pamlab employee—misreads the jury's verdict. There is no question that the jury's finding that "Pamlab gave [Black] a higher sales quota than a similarly situated male employee" meant that the jury found that Pamlab gave Black a higher sales quota than it would have given a male employee in her situation. Indeed, we know the jury found that absent discrimination, Pamlab would not have given Black a sales quota because, as Pamlab concedes, the jury calculated the back pay award based on Black having no sales quota. Pamlab Br. 19. The majority's mistaken view of the jury's verdict is not faithful to what it correctly recognizes is the "very deferential standard of review" that we must apply to a

_____

[2] The majority's only support is a remark by Black's attorney in her closing statement that Pamlab "'assigned [Black] a higher sales quota.'" Majority Op. 10. Obviously, though, anything above zero is "higher" and it is absurd to say that Black's attorney abandoned a central theory of her case with that single remark.

jury's verdict. Majority Op. 12; see, e.g., Garcia v. City of Houston, 201 F.3d 672, 675 (5th Cir. 2000) ("We give great deference to a jury's verdict . . . .").

Additionally, I concur in the majority's holding that Title VII's cap on compensatory and punitive damages is properly applied here to limit Black's total recovery for such damages because, under the familiar rules of claim preclusion, Black could not have brought her claims in separate lawsuits. I write separately to clarify that in a case in which the plaintiff has raised claims that, under the rules of claim preclusion, could have been brought in separate suits, the damages cap should be applied separately to each distinct claim or each related group of claims. This will avoid the absurd result that would ensue from applying Title VII's damages cap to limit the total recovery for all of the plaintiff's claims—that is, it will avoid encouraging litigants with distinct Title VII claims from bringing separate lawsuits to recover the maximum statutory damages available to them, which would waste judicial resources and unnecessarily run up attorney's fees. Accordingly, I concur in the majority's opinion in Part III.C for these reasons.

I.

From 2003 to 2006, Carleen Black worked as a sales representative for Pamlab, which manufactures and distributes pharmaceutical products. During that time, Black endured a litany of sexually inappropriate comments from Pamlab executives, including the company's president, Samuel Camp, and his son, Stephen Camp, who was Pamlab's Vice President of Sales. Notably, during her first training session, Samuel Camp asked Black if she planned to have more children and when she said "no" he responded, "Well, good, because usually females get hired on, get married, and/or get pregnant and they leave us"; at that same training session, Samuel Camp said that "women were a detriment to the company" and that Black "was taking a position from a male"; and on numerous occasions, Pamlab executives made sexually-derogatory comments

19

about Black—for instance: Tracy Johnson, Pamlab's Director of Sales for the Western United States, said to Black in front of other Pamlab employees, "I don't care what you're selling. I'll buy it, because I can't keep my eyes off your boobs"; Jody Redding, a district manager for Pamlab, was heard to say about Black, "love the rack," "[p]robably they're bought and paid for," and "[t]hey're not real"; during a company retreat, Redding asked Black in front of other Pamlab employees if he could come back to Black's hotel room with her; Stephen Camp was heard making comments about Black's "tits" and saying about Black, "Great body, but [I] wouldn't want to look at her while I'm having sex with her." Black complained frequently about these comments to her superiors at Pamlab; but her complaints were met with no response. Shortly after a national sales meeting at which Pamlab honored Black with an award for her outstanding sales figures, Pamlab abruptly and unexpectedly terminated Black.

Black sued Pamlab and the case was tried to a jury on three claims under Title VII.[3] Specifically, those claims were: (1) that Pamlab terminated Black because of her sex; (2) that Pamlab terminated Black in retaliation for her sexual harassment complaints; and (3) that Pamlab discriminated against Black on the basis of her sex by assigning her a sales quota.

With regards to her third claim, Black asserted that when she interviewed for the job with Pamlab, several Pamlab executives, including Stephen Camp, told her that in addition to a base salary, she would be paid commissions based on her sales. These executives told her that she would not have a sales quota that she would be required to reach before being paid commissions, viz., she

---

[3] Black also brought parallel state-law claims under the Texas Commission on Human Rights Act (THRCA), Tex. Labor Code § 21.001 et seq., but the parties do not discuss the THRCA claims in their briefs and limit their arguments solely to Title VII. For the purposes of this appeal, there is no difference between the state and federal law. See Giles v. Gen. Elec. Co., 245 F.3d 474, 492 (5th Cir. 2001) (the THRCA "damages limitation provision," Tex. Labor Code § 21.2585, is "identical to that in [Title VII,] § 1981a(b)(3)").

would receive commissions starting from her first dollar of sales. However, four months into her job, Black discovered that she had been given a $150,000 sales quota. This meant that Black was not being paid commissions on her first $150,000 in sales. Black also discovered that Shane Livingston, a Pamlab sales representative working in an adjacent sales territory in Las Vegas, had a significantly lower sales quota. When Black complained to Stephen Camp about her quota, he told her, "Well, it shouldn't matter to you, you're not the breadwinner anyway[,] . . . isn't your husband the one that makes the money." Black also spoke with Richard Rypkema, the head of Pamlab's Sales Information and Analytics department, who told her that he had reviewed the quotas directly with Samuel Camp, and that they, Rypkema and Camp, felt that Black's quota was fair. At trial, Pamlab contended that it set sales quotas based on a non-discriminatory formula derived from prior sales. However, Pamlab did not show how its formula led to Black's quota, nor did it explain how that formula resulted in no sales quotas for several other male Pamlab sales representatives; and Black introduced evidence that Stephen Camp and Samuel Camp had authority to dictate the sales quotas at Pamlab.

The jury returned a verdict in Black's favor on all three claims. As relevant here, the jury found that Black's sex was a motivating factor in Pamlab's decision to assign her a sales quota. The jury also found that Pamlab would not have made the same decision regarding Black's quota if it had not considered Black's sex. For each of Black's three claims—discriminatory termination, retaliatory termination, and discriminatory sales quota—the jury awarded Black $200,000 in compensatory damages and $150,000 in back pay. The jury also awarded $2,400,000 in total punitive damages.

Following the jury's verdict, Pamlab renewed its earlier motion for judgment as a matter of law under Federal Rule of Civil Procedure 50,[4] and made an alternative motion for a new trial. Pamlab argued, as relevant here, that the evidence was insufficient to support the jury's verdict and back pay award for Black's quota claim. Pamlab also argued that the jury's compensatory and punitive damages award should be reduced pursuant to Title VII's damages cap, which limits compensatory and punitive damages "for each complaining party" in "an action brought" under Title VII. See 42 U.S.C. § 1981a(a)(1), (b)(3). Pamlab took the position that the cap should be applied to limit Black's total recovery for compensatory and punitive damages for all of Black's claims, and Black argued that the cap should be applied separately to each of her three claims, so that she could recover the maximum amount allowed for each claim.

The district court denied Pamlab's motion for judgment as a matter of law in part, upholding the jury's verdict and back pay award for Black's quota claim. The court concluded that the evidence was sufficient for the jury to find that Pamlab discriminated against Black on the basis of her sex when it assigned her a sales quota because there was evidence that: Stephen Camp had promised Black that she would have no quota; Pamlab executives could manipulate the quotas; and when Black complained to Stephen Camp about her quota, he told her "don't worry about it—you're not the breadwinner in your family." The district court also sustained the jury's $150,000 back pay award for the quota claim. It determined that the jury could reasonably have found that based on Pamlab's commissions formula applied to Black's gross sales, without a sales

---

[4] "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" Reeves, 530 U.S. at 149 (quoting Fed. R. Civ. P. 50(a)).

quota, Black's commissions would have totaled $150,000 for the time that she worked for Pamlab.

The district court also granted Pamlab's motion in part and reduced Black's compensatory and punitive damages award to $200,000 based on Title VII's damages cap. See 42 U.S.C. § 1981a(b)(3)(C) ("[I]n the case of [an employer] who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year," the cap on compensatory and punitive damages is "$200,000."). The district court looked to the plain language of the statute, which applies the cap "for each complaining party," and noted that the cap did not apply "to each claim asserted by a party." Citing decisions from other circuits that have held that in a case with multiple Title VII claims, the cap applies per party and not per claim, the district court only allowed Black to recover the maximum amount under the cap for her suit.

Pamlab appealed and Black cross-appealed.

## II.

Contrary to the majority, I believe that there was adequate evidence to support the jury's back pay award for Black's claim that Pamlab discriminated against Black on the basis of her sex in violation of Title VII by assigning Black a sales quota, which limited the commissions she was paid. The jury found that Black's sex was a motivating factor in Pamlab's decision to assign Black a sales quota.[5] The jury also found that Pamlab would not have made the same decision regarding Black's quota absent the impermissible motivating factor of Black's

---

[5] Title VII makes it "an unlawful employment practice . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also provides that "an unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." Id. § 2000e-2(m).

sex, and awarded Black $150,000 in back pay.[6] The district court sustained the jury's back pay award for the quota claim based on a calculation of Black's commissions without any sales quota. Pamlab concedes that if the evidence was adequate to support a finding that Black would not have had any quota absent discrimination—what Pamlab and the majority refer to as Black's "zero quota theory"—the jury's $150,000 back pay award is supported by adequate evidence.[7] Therefore, if there was adequate evidence for a reasonable jury to find that absent discrimination, Pamlab would not have given Black any sales quota, the jury's back pay award should be sustained.

A.

i.

Our inquiry into the adequacy of the evidence supporting a jury's verdict in a discrimination case, such as this, is controlled by Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 & 223 n.4 (5th Cir. 2000) ("Reeves is the authoritative statement regarding the standard for judgment as a matter of law in

---

[6] Title VII allows for back pay damages, "[i]f the court finds that the [employer] has intentionally engaged in or is intentionally engaging in an unlawful employment practice." 42 U.S.C. § 2000e-5(g)(1). In a case, such as this, where "the complaining party demonstrates that [an impermissible motivating factor such as sex] was a motivating factor for any employment practice," id. § 2000e-2(m), an employer will avoid liability for back pay damage if it "demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor," id. § 2000e-5(g)(2)(B).

[7] In its renewed motion for judgment as a matter of law, Pamlab admitted that if there was "sufficient evidence of liability for [Black's] zero-quota Quota Claim, Defendants acknowledge that the [district court's] calculation could provide a proper non-quota basis to support the amount of the award for a motion for judgment as a matter of law." For the first time on appeal, Pamlab argues that even if the evidence supported a finding that Black would have received no quota absent discrimination, the evidence is still insufficient to support the amount of the back pay award because Bruce Holt was only asked about Pamlab's commissions formula for 2004 and 2005, and not for 2003. Pamlab waived this argument, however, by not raising it below. Martco Ltd. P'ship v. Wellons, Inc., 588 F.3d 864, 877 (5th Cir. 2009) ("[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal.").

24

discrimination cases."). Reeves involved a claim that Sanderson Plumbing Products, Inc., had violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., by firing Roger Reeves because of his age. 530 U.S. at 137-38.[8] Reeves, who was 57 years old, had been a supervisor in a department at Sanderson known as the "Hinge Room," and was responsible for "recording the attendance and hours of those under his supervision, and reviewing a weekly report that listed the hours worked by each employee." Id. Joe Oswalt, who was in his mid-30s, supervised another part of the Hinge Room; and Russell Caldwell, who was 45, supervised both Oswalt and Reeves. "Caldwell informed Powe Chesnut, the director of manufacturing and the husband of company president Sandra Sanderson, that 'production was down' in the Hinge Room because employees were often absent and were 'coming in late and leaving early.'" Id. at 137-38. "Chesnut ordered an audit of the Hinge Room's timesheets," and "[a]ccording to Chesnut's testimony, that investigation revealed 'numerous timekeeping errors and misrepresentations on the part of Caldwell, Reeves, and Oswalt.'" Id. at 138. "Following the audit, Chesnut," and two other Sanderson executives, "recommended to company president Sanderson that [Reeves] and Caldwell be fired. . . . Sanderson followed the recommendation and discharged both [Reeves] and Caldwell." Id.

Reeves sued, claiming that Sanderson fired him because of his age, in violation of the ADEA, and the case was tried to a jury. Id. Sanderson "contended that it had fired [Reeves] due to his failure to maintain accurate attendance records, while [Reeves] attempted to demonstrate that [Sanderson's]

---

[8] Although Reeves involved a claim under the ADEA, it controls this Title VII case. The Reeves Court assumed without deciding that "the McDonnell Douglas framework, developed to assess claims brought under . . . Title VII of the Civil Rights Act of 1964, [42 U.S.C. § 2000e-2(a)(1)], also applies to ADEA actions," id. at 142, and went on to decide the case within the context of the McDonnell Douglas framework. The Supreme Court and this court have applied Reeves in the context of a Title VII case. See, e.g., Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70 (2006); Laxton v. Gap Inc., 333 F.3d 572 (5th Cir. 2003).

explanation was pretext for age discrimination," by "introduc[ing] evidence that he had accurately recorded the attendance and hours of the employees under his supervision, and that Chesnut, whom Oswalt described as wielding 'absolute power' within the company, had demonstrated age-based animus in his dealings with" Reeves. Id. (citation omitted). The jury returned a verdict for Reeves, finding that "age was a determinative or motivating factor in the decision to terminate him." Id. at 138-39 (internal quotation marks omitted). Sanderson renewed its earlier motion for judgment as a matter of law, which the district court denied. Id. at 139. However, the Court of Appeals reversed, "holding that [Reeves] had not introduced sufficient evidence to sustain the jury's finding of unlawful discrimination." Id. (citing 197 F.3d 688, 694 (5th Cir. 1999)). The Court of Appeals said that the fact that Reeves had "offered sufficient evidence for 'a reasonable jury [to] have found that [Sanderson's] explanation for its employment decision was pretextual'" was not enough to sustain the jury's finding of intentional discrimination. Id. (quoting 197 F.3d at 693).

The Supreme Court reversed and upheld the jury's verdict. Id. at 154. The Court reviewed the evidence within the familiar framework explained in McDonnell Douglas v. Green, 411 U. S. 792 (1973). Id. at 142. Under this framework, "the plaintiff must [first] establish a prima facie case of discrimination." Id. at 142. Once the plaintiff meets this burden, the employer next bears the burden "'to produc[e] evidence of a legitimate, nondiscriminatory reason'" for its challenged employment practice. Id. (alteration in original) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U. S. 248, 254 (1981)). If the employer meets this burden, "'the McDonnell Douglas framework—with its presumptions and burdens'—disappear[s], and the sole remaining issue" is whether the plaintiff has met his "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against'" him. Id. at 143 (quoting

26

St. Mary's Honor Cntr. v. Hicks, 509 U. S. 502, 510 (1993); Burdine, 450 U. S. at 253)). The Reeves Court explained that "the plaintiff may attempt to establish that he was the victim of intentional discrimination "'by showing that the employer's proffered explanation is unworthy of credence,'" because "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id. (quoting Burdine, 450 U. S. at 253). That is, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Id. at 147-48. The Court noted that in deciding "whether the defendant's explanation is pretextual," the jury "may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom.'" Id. at 143 (quoting St. Mary's Honor Cntr., 509 U. S. at 511; Burdine, 450 U. S. at 253).

The Court concluded that the Court of Appeals had erred in setting aside the jury's finding because, in "'determin[ing] whether Reeves presented sufficient evidence that his age motivated [Sanderson's] employment decision,' . . . [the lower court had] ignored the evidence supporting [Reeves'] prima facie case and challenging [Sanderson's] explanation for its decision." Id. (quoting 197 F.3d at 693). The Supreme Court unanimously held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148; see also id. at 154 (Ginsburg, J., concurring) ("The Court today holds that an employment discrimination plaintiff may survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a 'prima facie case,' as that term is used in [McDonnell Douglas Corp.]; and second, evidence from which a rational

factfinder could conclude that the employer's proffered explanation for its actions was false.").

The Court went on to decide that the evidence was adequate to sustain the jury's verdict. Id. at 151-54. According to the Court, Reeves had met his burden of establishing a prima facie case by showing that "(i) at the time he was fired, he was a member of the class protected by the ADEA . . . , (ii) he was otherwise qualified for the position of Hinge Room supervisor, (iii) he was discharged by [Sanderson], and (iv) [Sanderson] successively hired three persons in their thirties to fill [Reeves'] position." Id. at 142. The Court also explained that Reeves had "creat[ed] a jury issue as to the falsity of [Sanderson's] explanation." Id. at 151. Sanderson had argued "that [Reeves] was fired because of his failure to maintain accurate attendance records" and for "fail[ing] to discipline absent and late employees." Id. at 142, 143-44. In response, Reeves "offered evidence that he had properly maintained the attendance records": Reeves and Oswalt "testified that the company's automated time clock often failed to scan employees' timecards, so that the timesheets would not record any time of arrival," in which case Reeves and Oswalt "would visually check the workstations and record whether the employees were present at the start of the shift," and if they were, Reeves and Oswalt would record the starting time of the shift on the employees' timecard. Id. at 144-45. Also, Reeves had "cast doubt on whether he was responsible for any failure to discipline late and absent employees": Reeves testified that "disciplinary writeups were based on the monthly reports, which were reviewed by Caldwell," and "Sanderson admitted that Caldwell . . . was responsible for citing employees for violations of the company's attendance policy"; Reeves also testified that Chesnut told him he was fired for not reporting the absence of an employee on two days when Reeves was, in fact, in the hospital, and Reeves "stated that on previous occasions" when an employee's hours had been misreported, "the company had simply adjusted those

employees' next paychecks to correct the errors." Id. at 145. According to the Court, this evidence met its test that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148.

Nonetheless, the Court went on to explain that "it [was] apparent that [Sanderson] was not entitled to judgment as a matter of law" because "in addition to establishing a prima facie case of discrimination and creating a jury issue as to the falsity of the employer's explanation, [Reeves] [had] introduced additional evidence that Chesnut was motivated by age-based animus and was principally responsible for [Reeves'] firing." Id. at 151. The Court explained this "additional evidence" as follows:

> [Reeves] testified that Chesnut had told him that he "was so old [he] must have come over on the Mayflower" and, on one occasion when [Reeves] was having difficulty starting a machine, that he "was too damn old to do [his] job." According to [Reeves], Chesnut would regularly "cuss at me and shake his finger in my face." Oswalt, roughly 24 years younger than [Reeves], corroborated that there was an "obvious difference" in how Chesnut treated them. He stated that, although he and Chesnut "had [their] differences," "it was nothing compared to the way [Chesnut] treated [Reeves]." Oswalt explained that Chesnut "tolerated quite a bit" from him even though he "defied" Chesnut "quite often," but that Chesnut treated [Reeves] "[i]n a manner, as you would . . . treat . . . a child when . . . you're angry with [him]." [Reeves] also demonstrated that, according to company records, he and Oswalt had nearly identical rates of productivity in 1993. Yet [the defendant employer] conducted an efficiency study of only the regular line, supervised by [Reeves], and placed only [Reeves] on probation. Chesnut conducted that efficiency study and, after having testified to the contrary on direct examination, acknowledged on cross-examination that he had recommended that [Reeves] be placed on probation following the study.
> Further, [Reeves] introduced evidence that Chesnut was the actual decisionmaker behind his firing. Chesnut was married to

Sanderson, who made the formal decision to discharge [Reeves]. Although Sanderson testified that she fired [Reeves] because he had "intentionally falsif[ied] company pay records," [the defendant employer] only introduced evidence concerning the inaccuracy of the records, not their falsification. A 1994 letter authored by Chesnut indicated that [Chesnut] berated other company directors, who were supposedly his coequals, about how to do their jobs. Moreover, Oswalt testified that all of [the defendant employer's] employees feared Chesnut, and that Chesnut had exercised "absolute power" within the company for "[a]s long as [he] can remember."

Id. at 151-52 (citations omitted).

The Court faulted the Court of Appeals for discounting this evidence because in so doing, it "misapplied the standard of review dictated by Rule 50." Id. at 152. The Court explained the proper standard of review in entertaining a Rule 50 motion for judgment as a matter of law as follows:

[Courts] must draw all reasonable inferences in favor of the nonmoving party, and . . . not make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Thus, although [we] should review the record as a whole, [we] must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, [we] should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

530 U.S. at 150-51 (citations omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529, at 297-301 (2d ed. 1995)). According to the Court, the Court of Appeals improperly discounted Chesnut's age-related comments because they "'were not made in the direct context of Reeves' termination'" and erroneously "discredited [Reeves'] evidence that Chesnut was the actual decisionmaker by giving weight to the fact that" there were other decisionmakers involved. Id. at 153-54 (quoting 197 F.3d at 693-94). The Court

also said that "the other evidence on which the [Court of Appeals] relied—that Caldwell and Oswalt were also cited for poor recordkeeping, and that [Sanderson] employed many managers over age 50—although relevant, [was] certainly not dispositive." Id. at 153. By "concluding that these circumstances so overwhelmed the evidence favoring [Reeves] that no rational trier of fact could have found that [Reeves] was fired because of his age, the Court of Appeals impermissibly substituted its judgment concerning the weight of the evidence for the jury's." Id.

In concluding its opinion in Reeves, the Court reminded us that "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination. . . . Given that [Reeves] established a prima facie case of discrimination, introduced enough evidence for the jury to reject [Sanderson's] explanation, and produced additional evidence of age-based animus, there was sufficient evidence for the jury to find that [Sanderson] had intentionally discriminated." Id. at 153-54. We are bound to follow this analysis in determining the sufficiency of the evidence here.

ii.

Black established her prima facie case of discrimination. While the case law notes various formulations of what constitutes a prima facie case of discrimination, the Supreme Court has said that there is no strict formula. McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required [of the plaintiff in this case] is not necessarily applicable in every respect to differing factual situations."); see also Burdine, 450 U.S. at 253 n.6. "[T]he prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Burdine, 450 U.S. at 253-54. Therefore, the prima facie

case requires the plaintiff to show that the challenged employment decision was made "under circumstances which give rise to an inference of unlawful discrimination." Id. at 253.

Black established her prima facie case of discrimination by showing that: (i) Pamlab executives, including Stephen Camp, promised Black that she would not have a sales quota; (ii) Black was later given a sales quota; (iii) Stephen Camp and Samuel Camp had authority to adjust sales quotas at Pamlab; and (iv) when Black asked Stephen Camp why she was given a sales quota, he told her, "Well, it shouldn't matter to you, you're not the breadwinner anyway[,] . . . isn't your husband the one that makes the money."

The comment by Stephen Camp is particularly significant because, as Judge Wisdom explained in Brown v. CSC Logic, Inc., 82 F.3d 651 (5th Cir. 1996), "[s]uch remarks may serve as sufficient evidence of . . . discrimination" to establish a plaintiff's prima facie case "if the offered comments are: 1) [sex] related; 2) proximate in time to the [employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." 82 F.3d at 655-56 (footnotes omitted). Stephen Camp's comment meets the Brown test: (1) The comment is undeniably sex-related, viz., it reflects a patent sex-based stereotype, which, parenthetically, was not true for Black, who worked while her husband was retired. (2) The comment was proximate in time to the decision to give Black a sales quota. Compare Trial Tr. vol. 1, 241, June 8, 2009 (Black's testimony that she discovered she had been given a sales quota four months after working for Pamlab), with Palasota v. Haggar Clothing Co., 342 F.3d 569, 576 (5th Cir. 2003) (relying on discriminatory comment made within two months of employment decision as sufficiently proximate in time). (3) The comment was made in response to Black's inquiry about her sales quota and is directly related to Black's quota. (4) The evidence supports the fact that Stephen and Samuel

32

Camp had authority to dictate sales quotas at Pamlab. Indeed, Pamlab expressly concedes this point. See Pamlab's Reply Br. 5 (Black "identifies testimony stating the Camps have the authority to adjust quotas").[9]

Accordingly, Black has established a prima facie case of discrimination. Therefore, we must decide if there was "sufficient evidence to find that the employer's asserted justification is false." Reeves, 530 U.S. at 148.

### iii.

There was sufficient evidence for the jury to disbelieve Pamlab's nondiscriminatory justification for why Black was given any sales quota. Pamlab contended that the company assigned sales quotas based on a nondiscriminatory formula derived from prior sales of pharmaceutical products sold in a given territory. The evidence supporting this explanation consisted of the testimony of Bruce Holt, Pamlab's Director of Sales Information and Analytics, that he was solely responsible for setting the company's sales quotas and employed this formula in doing so, and that neither Stephen Camp nor

---

[9] Although Pamlab now concedes this, even if Pamlab continued to argue that there was no evidence that the Camps had the authority to set sales quotas, that argument would fail. We are required to "draw all reasonable inferences in favor of" Black, and "disregard all evidence favorable to [Pamlab] that the jury is not required to believe," Reeves, 530 U.S. at 150-51. Lance Whatley, a national accounts manager for Pamlab, was asked, "who sets the commission in the company and quotas?" and he testified, "At the time it was usually Stephen [Camp] and Bruce Holt." Further, immediately after Holt testified that the Camps did not have the authority to set the sales quotas, he was asked, "Do you have the authority to change the quotas after you set them?" and Holt responded, "If they so deemed, yes." Holt's answer, viewed in the light most favorable to Black, indicates that "they," Stephen Camp and Samuel Camp, had the authority to direct Holt to change the sales quotas. This is unsurprising considering Samuel Camp was Pamlab's President and Stephen Camp was Samuel Camp's son and Pamlab's Vice President of Sales. Finally, Black testified that when she spoke with Richard Rypkema, an executive in Pamlab's Sales Information and Analytics Department, Rypkema told her that he conferred with Samuel Camp about the sales quotas and set them according to what Samuel Camp and Rypkema believed was fair. This contradicts Holt's and Stephen Camp's testimony that the Camps were not involved in the quota decisions. Therefore, the evidence that we must credit supports the fact that Stephen Camp and Samuel Camp had the authority to set the sales quotas. See id. at 152-53.

Samuel Camp had the authority to set quotas; and Stephen Camp's testimony that he did not have the authority to set the company's sales quotas.

However, Black made "a substantial showing" that Pamlab did not always set sales quotas based on a neutral formula, and she "cast doubt" on whether Pamlab's justification explained Black's particular sales quota. See Reeves, 530 U.S. at 144-45. First, as described supra note 7, Pamlab now concedes that there was evidence that Pamlab's sales quotas were not always set based on a neutral formula, but that Stephen Camp and Samuel Camp had the authority to set sales quotas "as they so deemed." Further, Black testified that Richard Rypkema told her that he consulted with Samuel Black in setting Black's sales quotas, and that he, Rypkema, set Black's quota based on what he and Samuel Camp felt was fair.[10] Second, Pamlab never explained specifically how its formula resulted in Black's particular sales quota. Also, its own evidence includes numerous examples of Pamlab sales representatives who had no quotas, see Def.'s Trial Ex. 7, and Pamlab never explained how its supposedly neutral formula resulted in no sales quota for those employees. Parenthetically, most, if not all, of those employees were men. See id. This is significant because according to Reeves, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" 530 U.S. at 143 (quoting Burdine, 450 U.S. at 256). Together, this evidence "creat[ed] a jury issue as to the falsity of [Pamlab's] explanation" for Black's sales quota. Id. at 151.

Thus, Black "established a prima facie case of discrimination[] [and] introduced enough evidence for the jury to reject [Pamlab's] explanation" for why

---

[10] Even though this evidence was part of Black's prima facie case, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." Reeves, 530 U.S. at 143 (alteration in original) (internal quotations marks omitted).

Black was given a sales quota. Id. at 153. According to Reeves, these two showings "may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148. Since there is no dispute that the jury's back pay award was justified if the evidence was adequate for a reasonable jury to find that Pamlab discriminated against Black by giving her any sales quota, and, under Reeves, the evidence was adequate to support such a finding, we should sustain the jury's back pay award.[11]

iv.

Moreover, there was additional evidence here that Stephen and Samuel Camp were motivated by sex-based animus and that they were principally responsible for Black's sales quota. Again, Reeves made perfectly clear that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148. Nevertheless, in concluding that it was "apparent" that the evidence was adequate to sustain the jury's verdict in Reeves, the Court noted that, "in addition to establishing a prima facie case of discrimination and creating a jury issue as to the falsity of the employer's explanation, [Reeves had] introduced additional evidence that Chesnut was motivated by [discriminatory] animus and was principally responsible for [Reeves'] firing." Id. at 151. Accordingly, we should consider whether there was similar "additional evidence" here, and indeed, there was: the

---

[11] The Reeves Court noted that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." 530 U.S. at 148. The Court illustrated those instances as follows: "[I]f the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Id. (emphasis added) (internal quotation marks and citations omitted). It is clear that this case does not present one of those "rare" instances. See Russell, 235 F.3d at 222.

evidence showed that Stephen Camp and Samuel Camp were motivated by sex-based animus and were primarily responsible for Black's sales quota.

The evidence of the Camps' sex-based animus is analogous to the age-based comments that the Reeves Court said demonstrated a motivation of discriminatory animus. First, Black and two other Pamlab employees testified about sexually derogatory remarks made by Stephen Camp, such as, "[Black has a] [g]reat body, but [I] wouldn't want to look at her while I'm . . . having sex with her." See id. ("[Reeves] testified that Chesnut had told him that he 'was so old [he] must have come over on the Mayflower' . . . ."). Further, Black testified that both Samuel Camp and Stephen Camp made comments that women were a detriment to the company and that Black was taking a job away from a man. See id. (Reeves testified that "on one occasion when [Reeves] was having difficulty starting a machine, [Chesnut said] that he 'was too damn old to do [his] job,'" and "Chesnut would regularly 'cuss at me and shake his finger in my face.'"). Also, Black testified that during her first training session at Pamlab, Samuel Camp told her that it was "good," that she didn't plan to have more children "because usually females get hired on, get married, and/or get pregnant and they leave us." Therefore, Black introduced relevant evidence that Stephen Camp and Samuel Camp were motivated by sex-based animus.

There was also evidence that the Camps were principally responsible for Black's sales quota: Samuel Camp was the President of Pamlab, and Stephen Camp was Samuel Camp's son and Pamlab's Vice President of Sales; Bruce Holt testified that the Camps could set the company's sales quota "if they so deemed"; Lance Whately testified that Bruce Holt and Stephen Camp set the quotas; and Black testified that when she spoke with Richard Rypkema about her quota, he told her that he consulted with Samuel Camp and set the quota based on what he and Camp thought was fair. This evidence is at least as probative of the Camps' responsibility for assigning Black a quota as the evidence that the Reeves

Court concluded was sufficient to show that Chesnut was "the actual decisionmaker behind [Reeves'] firing." Id. at 152.[12]

Therefore, "[g]iven that [Black] established a prima facie case of discrimination, introduced enough evidence for the jury to reject [Pamlab's] explanation, and produced additional evidence of [sex]-based animus, there was sufficient evidence for the jury to find that [Pamlab] had intentionally discriminated." See id. at 153-54. The undisputed fact is that the jury's $150,000 back pay award for Black's quota claim was justified so long as the evidence was adequate for a reasonable jury to find that Pamlab was motivated by Black's sex in assigning her any quota, and thus, we must sustain the jury's back pay award. Accordingly, unlike the majority, I would uphold the jury's back pay award for Black's quota claim.

B.

In my view, the majority falls into error by accepting Pamlab's inapposite argument that the evidence was insufficient to support the jury's back pay award for Black's quota claim "because Black offered no evidence of another comparator who was given a promise of a zero quota and was given no quota." Majority Op. 11.[13] Such comparator evidence is not necessary to support the

---

[12] The evidence cited by the Reeves Court as showing that Chesnut was the "the actual decisionmaker behind [Reeves'] firing" was, in its entirety, as follows: "Chesnut was married to Sanderson, who made the formal decision to discharge [Reeves]. Although Sanderson testified that she fired [Reeves] because he had 'intentionally falsif[ied] company pay records,' [the defendant employer] only introduced evidence concerning the inaccuracy of the records, not their falsification. A 1994 letter authored by Chesnut indicated that he berated other company directors, who were supposedly his coequals, about how to do their jobs. Moreover, Oswalt testified that all of [the defendant employer's] employees feared Chesnut, and that Chesnut had exercised 'absolute power' within the company for '[a]s long as [Oswalt could] remember.'" 530 U.S. at 152 (third alteration in original).

[13] Pamlab argues that "Black failed to establish even a prima facie claim of discrimination under the zero-quota theory . . . and, therefore, there is no basis in the Record to support $150,000 in Back Pay commissions." Pamlab's Br. 18-19. This argument, of course, is beside the point. See Postal Serv. Bd. of Governors v. Aikens, 360 U.S. 711, 713-14 (1983) ("Because this case was fully tried on the merits, it is surprising to find the parties . . . still

jury's award. The plain language of Title VII only requires showing that the complained-of employment action was "because of" an impermissible factor, such as sex, or that the impermissible factor was "a motivating factor" in the employment decision. See 42 U.S.C. § 2000e-2(a)(1), (m). The statute does not require evidence of a comparable employee whom the employer treated differently than the Title VII plaintiff. To the contrary, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves, 530 U.S. at 153; see also Palasota, 342 F.3d at 574 ("Where a case has been fully tried, . . . the panel should examine whether the plaintiff has met his ultimate burden of proving that the employer terminated him because of" an impermissible factor. (citing Aikens, 360 U.S. at 714)); Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158-59 (7th Cir. 1996) ("The central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same.").

As already explained, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," Reeves, 530 U.S. at 148, and the Supreme Court has never said that a plaintiff's prima facie case requires evidence that a comparable employee was treated differently. Indeed, in the seminal case of McDonnell Douglas, the Court first described a prima facie case of discrimination under Title VII as a showing "(i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that,

---

addressing the question whether [the plaintiff] made out a prima facie case. . . . [B]y framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination vel non.").

despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802. Thus, the McDonnell Douglas Court endorsed a prima facie case that did not include comparator evidence. Id. Likewise, this court has held that a prima facie case of sex discrimination can be established without comparator evidence. See, e.g., Rutherford v. Harris Cnty., Tex., 197 F.3d 173, 179 (5th Cir. 1999) ("to establish a prima facie case" the plaintiff must "demonstrate that (1) she was not promoted, (2) she was qualified for the position she sought, (3) she was within the protected class at the time of the failure to promote, and (4) either the position she sought was filled by someone outside the protected class or she was otherwise not promoted because of her sex" (emphasis added)).[14]

Instead, comparator evidence is only one form of circumstantial evidence that may be useful, but is not necessary, to prove the ultimate question of discrimination vel non, and circumstantial evidence itself is not required where there is direct evidence. See, e.g., Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 622-23 (1985) ("[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination. The shifting burdens of proof set forth in McDonnell Douglas are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence." (internal

---

[14] One treatise offers a similar, "one-size-fits-all," version of the prima facie case, which does not include comparator evidence:

> Ordinarily, a plaintiff must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.

1 Charles A. Sullivan & Lauren M. Walter, Employment Discrimination Law & Practice § 2.09[F], at 122 (4th ed. 2009) (citing Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996)).

quotation marks and brackets omitted) (citing Teamsters, 431 U.S. at 358 n.44)); see also Rutherford, 197 F.3d at 180 n.4 ("a plaintiff must ordinarily use circumstantial evidence to" establish her prima facie case but, "[o]f course, a plaintiff can rely on direct evidence" (internal quotation marks omitted)); 1 Charles A. Sullivan & Lauren M. Walter, Employment Discrimination Law & Practice § 2.01, at 59 (4th ed. 2009) (describing "the various proof structures the courts have developed" to prove discrimination, and identifying "proving discrimination through use of 'comparators'" as "an alternative proof structure").

There are many ways to prove that an employment decision was discriminatory. The majority is simply mistaken that Black needed to introduce evidence that another employee was promised no quota and received no quota, in order for a reasonable jury to find that Pamlab would not have assigned Black a sales quota if she was not a woman. As discussed supra, because there was sufficient evidence, without a comparator, for a reasonable jury to find that Pamlab would not have assigned Black a sales quota absent discrimination, we must sustain the jury's back pay award.

### III.

Regarding the application of Title VII's cap on compensatory and punitive damages, I concur in the majority's decision that the cap is properly applied here to limit Black's total recovery for such damages for all three of her claims, viz., that Pamlab: (1) discriminated on the basis of sex in assigning Black a sales quota, (2) terminated Black because of her sex, and (3) terminated Black in retaliation for complaining about sexual harassment. Specifically, I concur because under the familiar rules of claim preclusion, Black could not have brought her claims in separate lawsuits. I write separately to point out that this would be a different case if Black had raised claims that were sufficiently distinct that Black could have brought her claims in separate suits. In that case, Title VII's cap on compensatory and punitive damages should be applied

separately to each distinct claim or each group of related claims in order to avoid an absurd result, viz., if plaintiffs with claims that are sufficiently distinct that they can be brought in separate suits are forced to bring different suits for each distinct claim or each group of related claims to recover the maximum amount of compensatory and punitive damages provided by Title VII, judicial resources will be wasted and attorney's fees will be needlessly inflated.

Title VII provides that "[i]n an action brought by a complaining party [under Title VII], . . . the complaining party may recover compensatory and punitive damages." 42 U.S.C. § 1981a(a)(1). The statute limits, however, the amount of compensatory and punitive damages that can be awarded, depending on the number of employees that the defendant employer has: For an employer like Pamlab with more than 200 employees, "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party . . . $200,000." Id. § 1981a(b)(3). The district court applied this provision to limit the total compensatory and punitive damages that Black could recover to $200,000. Black argues that the court erred because the cap should be applied separately to each of her three claims since the claims "are separate, distinct and independent causes of action—each of which could have been brought on its own," and because she suffered separate harms from the discrimination related to each claim. Black argues that Congress intended Title VII to allow a plaintiff to fully recover damages for each distinct harm that the plaintiff has suffered, and therefore, she is entitled to $200,000 for each of her three claims.

Even if Black is correct that the congressional purpose of Title VII was to ensure full recovery for every distinct harm caused by unlawful discrimination and that she has suffered separate harms from the discrimination related to

41

each of her three claims, "[w]e may not look beyond the text of the statute except in those rare instances where using the plain meaning of the text creates an 'absurd result.'" Peter v. GC Servs. L.P., 310 F.3d 344, 351 (5th Cir. 2002) (quoting In re Hammers, 988 F.2d 32, 34 (5th Cir. 1993)). "The statute plainly states that '[i]n an action brought by a complaining party . . . the complaining party may recover compensatory and punitive damages' in a sum not to exceed 'for each complaining party . . . $[2]00,000.'" Baty v. Willamette Indus., Inc., 172 F.3d 1232 (10th Cir. 1999) (emphasis in original) (quoting 42 U.S.C. § 1981a), overruled on other grounds Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Accordingly, "[t]he unit of accounting is the litigant, not the legal theory." Smith v. Chi. Sch. Reform Bd. of Trs., 165 F.3d 1142, 1150 (7th Cir. 1999). Further, applying the plain meaning of the statute here, to limit Black's total recovery for compensatory and punitive damages for all of her claims, will not lead to an absurd result: Since all of Black's claims had to asserted in the same litigation according to the familiar rules of claim preclusion,[15] applying the cap to limit Black's total recovery does not cause Black to recover any less than exactly what Title VII provides.

However, this would be a different case if Black had asserted claims that were not based on the same nucleus of operative facts and could have been

---

[15] This court applies the "transactional test" to determine if later-brought claims are precluded by an earlier-brought lawsuit. See Davis v. Dallas Area Rapid Transit, 383 F.3d 309, 313 (5th Cir. 2004). "The critical issue under the transactional test is whether the two actions are based on the 'same nucleus of operative facts.'" Id. (quoting Petro-Hunt, L.L.C. v. United States, 365 F.3d 385, 396 (5th Cir. 2004)) ("What grouping of facts constitutes a 'transaction' or a 'series of transactions' must 'be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." (quoting Petro-Hunt, 365 F.3d at 395-96, in turn quoting Restatement (Second) of Judgments § 24(2) (1982))). It is clear that Black's discriminatory termination, discriminatory sales quota, and retaliatory firing claims are based on the same nucleus of operative facts, and therefore, Black had to assert all three claims in the same suit to avoid claim preclusion. See id.

brought in separate lawsuits. In that case, it would lead to an absurd result to not apply Title VII's damages cap separately, to each distinct claim or each related group of claims, viz., a plaintiff with distinct claims would be forced to bring separate lawsuits for each claim or each related group of claims, in order to recover the full amount of compensatory and punitive damages that Title VII provides. This, of course, would waste precious judicial resources and result in exponentially higher attorney's fees than would otherwise be necessary. See Barroso v. Gonzales, 429 F.3d 1195, 1207 (9th Cir. 2005) ("when interpreting [a federal statute], we avoid an interpretation that would lead to an absurd result, such as the expenditure of unnecessary judicial resources" (internal quotation marks omitted)). Indeed, the Sixth, Seventh, and D.C. Circuits, have recognized the absurdity of such a result and have posited that the law of claim preclusion would provide a practical rule for distinguishing separate claims. See Fogg v. Ashcroft, 254 F.3d 103, 109-10 (D.C. Cir. 2001); Smith, 165 F.3d at 1150; Hudson v. Reno, 130 F.3d 1193, 1200 (6th Cir. 1997), abrogated on other grounds, Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 847-48 (2001).[16]

Therefore, I concur in Part III.C of the majority's opinion with the additional explanation that in a different case, with claims that are distinct for the purposes of claim preclusion, Title VII's damages cap should be applied separately for each distinct claim or each related group of claims.

CONCLUSION

---

[16] The Tenth Circuit also considered the question of the proper application of Title VII's damages cap in Baty. See 172 F.3d 1232. However, the Baty court did not need to address the specific issue of whether, in a case with claims that were unrelated according to the rules of claim preclusion, the cap applied separately to each claim because the claims in that case were clearly sufficiently related for the purposes of claim preclusion. Id.

For the foregoing reasons, I respectfully dissent from Part III.B and concur in Part III.C of the majority's opinion.